THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JEFFREY J. GURGA, Defendant-Appellant.

First District (3rd Division)   No. 83—2039

Opinion filed November 19, 1986.—Rehearing denied January 6, 1987.

Julius Lucius Echeles, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Defendant, Jeffrey Gurga, pleaded not guilty by reason of insanity to charges of murder, attempted murder, and home invasion. Following a bench trial, the court found defendant guilty of those crimes, and it sentenced him to concurrent terms of 40, 30, and 20 years. Defendant appeals.

On August 9, 1982, around 2 a.m., defendant went for a walk in his neighborhood. He saw a light and heard female voices coming from an apartment that he passed. He returned to his home. He went out again at 3:30 a.m., wearing gloves on his hands and blacking substance on his face, and carrying a screwdriver, pliers, a knife, and a knotted necktie. He broke into the second-floor apartment from which he had earlier heard voices. This was the apartment of Kathleen and Janine Pearson, who were complete strangers to the defendant. Defendant put down the screwdriver, pliers, and necktie near the patio door. He took a picture of Janine from the piano and placed it near the tools.

Defendant went into one of the bedrooms, carrying his knife. He stabbed Janine three times in the back before she woke up. She struggled briefly, then she let her body go limp and she held her breath. Her mother, Kathleen, woke up and opened her bedroom door. Defendant left Janine's room and attacked Kathleen in her bedroom, stabbing her repeatedly while she struggled. Janine called 911 and ran into the hallway of the apartment building, knocking on doors. She went back to her apartment.

Charles and Betty Armstrong, who lived in the apartment one floor down from the Pearson's apartment, came upstairs. Charles went to Kathleen's bedroom, where he saw defendant kneeling over Kathleen, holding a bloody knife. He told defendant to "drop the fucking knife." Defendant dropped the knife and said, "[M]y God, I went bananas." Armstrong told defendant to lie face down on the living room floor. Defendant cooperated. Several times defendant said, "[W]here are the paramedics, where's the ambulance?" He remained on the floor until the police arrived.

Kathleen Pearson died that morning. Janine was severely injured, but she survived.

At trial police officer Joseph Maraffino testified that when he entered the Pearson's apartment defendant was lying on the floor. He asked defendant his name, and defendant said, "Help these women. I don't know these women. Call an ambulance." Maraffino placed defendant under arrest and read him his *Miranda* rights. He asked defendant if he understood each of these rights and defendant replied,

"Yes." Maraffino testified that he then asked, "Do you wish to answer questions at this time?" and defendant did not answer. Defense counsel objected, and the court overruled the objection.

Police detective Raymond Kruel testified that he searched defendant's apartment on August 9, 1982. The apartment was extraordinarily messy. He removed a diary from the apartment along with many papers on which defendant had written notes.

Jacqueline Tashchner, a cryptologist, testified that she deciphered part of defendant's diary and the notes on some of the papers which Kruel found crumpled near a tool box. The diary was written in a cipher alphabet. The passages she deciphered referred to jobs and resumes. One of the papers contained a tree diagram of the kind commonly used in studies of probability. It showed possible outcomes for an encounter between a man and a woman, including such possibilities as, "They become lovers," "They part," and, "He forgets about her." One vertex was labeled, "He kills her." There were two possible outcomes following from that vertex. Tashchner testified that the notation indicated that defendant assumed that there was a 20% chance of the result being "He is caught and sent to prison," and an 80% chance of the result being "He escapes undetected."

A partner in the law firm which employed defendant testified for the defense that defendant was a "highly competent" attorney. On August 2, 1982, defendant told the partner that he was leaving his job with the firm in three weeks because he felt "burned out." Defendant represented one of his clients at a hearing in court on August 6, 1982. The partner testified that he had never seen defendant act in a bizarre manner.

Dr. John Adams, a psychiatrist, testified for the defense that in his opinion defendant was suffering from schizophrenia, a mental disease, and that due to that disease he was unable to conform his conduct to the requirements of law on the morning of August 9, 1982. Dr. Robert Reifman, also a psychiatrist, testified for the State that in his opinion, defendant suffered from an obsessive compulsive disorder with a schizoid personality. He testified that this was not a mental disease or defect, within the legal meanings of those terms, and in his opinion defendant was capable of conforming his conduct to the requirements of law when he stabbed Kathleen and Janine Pearson. The psychiatrists used essentially the same information regarding defendant's psychiatric history in forming their opinions, and each psychiatrist conducted several interviews with defendant.

In explanation of his diagnosis, Dr. Adams emphasized defendant's extensive history of mental illness. In 1966, while defendant was

an undergraduate at the University of Illinois, he attacked a female student, a stranger to him, with a penknife. He inflicted a superficial injury before he ran out of her room. The day after the incident, a psychiatrist at the University interviewed defendant and diagnosed him as having a "[s]chizophrenic reaction—chronic undifferentiated type." Defendant was hospitalized for 3½ months, and he continued as an outpatient for a year after his release. Dr. Adams largely agreed with the assessments made by the psychiatrists who treated defendant in 1966 and 1967, although their terminology was different from his because of varying diagnostic considerations and variations in standard terminology.

Dr. Adams said that defendant again struggled to control his impulses in 1970, at the end of his first year of law school, when he became absorbed in his fantasies to the extent that he did not take his final examinations. Defendant dropped out of school and joined the National Guard. In 1971 defendant enrolled at the University of Illinois Law School. The psychiatrist who evaluated defendant prior to his readmission diagnosed him as paranoid schizophrenic in remission. Dr. Adams agreed with that evaluation.

Defendant last sought help in his struggle to control his impulses in 1975, when he went to see a psychiatrist to discuss his "brutally debilitating" fantasies. That psychiatrist prescribed stelazine, which is ordinarily prescribed for schizophrenia. Dr. Adams explained that, even though defendant had been able to maintain control since 1975, there were many indications that his psychological condition was steadily deteriorating prior to his schizophrenic break on August 9, 1982. Defendant's schizophrenic thought processes were reflected in his extensive use of symbolic languages, including both the ciphers used in his diary and the tree diagrams discussed above. The number of stab wounds which defendant inflicted on Kathleen was a further indication of his lack of control over his actions.

Dr. Reifman, in support of his contrary opinion, emphasized that defendant was coherent and logical when he talked to Dr. Reifman, and he showed no overt serious psychiatric symptoms such as hallucinations or delusions. Dr. Reifman said:

> "It was my impression that he, although he had a strong fantasy life, that he always could distinguish the difference between fantasy and reality. And that his reality testing ability was good and that his reality testing ability was specifically good after he was apprehended.
>
> He knew exactly where he was, what he had done and he was fully aware of his legal-illegal implications. He did not talk

or say anything. He asked to see his attorney so that he was not out of contact with reality before or after."

Dr. Reifman also emphasized defendant's apparent ability to plan the crime and defendant's statement that if anyone had encountered him on the street before he arrived at the Pearson's apartment he probably would not have done what he did.

Dr. Reifman found that defendant suffered from an obsessive compulsive disorder with a schizoid personality and alcoholism; however, in his opinion defendant did not suffer from a psychosis such as schizophrenia. Dr. Reifman testified that his diagnosis agreed with the diagnoses made by several of the psychiatrists who evaluated defendant before 1982, but he disagreed with the diagnoses made by several other psychiatrists, including Dr. Adams. Dr. Reifman testified that defendant "was overwhelmed with sadistic sexual fantasies, that he had difficulty controlling." However, in Dr. Reifman's opinion, defendant chose not to control his behavior on the morning of August 9, 1982.

On appeal defendant argues that: (1) he was not proved sane beyond a reasonable doubt; (2) the statute regarding the insanity defense is unconstitutional; (3) the court considered inadmissible evidence; (4) if defendant were legally sane, the trial court should have found him "guilty but mentally ill"; (5) the court should have held a hearing regarding psychological treatment of defendant during his term of imprisonment; and (6) the sentence is excessive and unconstitutional.

■ In order to sustain its burden of proof on the issue of sanity, the State needed to prove either (a) that defendant was not suffering from a mental disease, or (b) that he did not lack capacity to conform his conduct to the requirements of law, as a result of such disease, at the time that he killed Kathleen. (Ill. Rev. Stat. 1981, ch. 38, par. 6—2(a).) Defendant contends that the State proved neither of these propositions. The trial court determined:

"[T]he total evidence establishes beyond a reasonable doubt that the defendant, Jeffrey Gurga, at the time of the commission of the crimes with which he is charged was able to appreciate the criminality of his acts and was able to conform his conduct to the requirements of the law."

If this finding is not erroneous, the State has proved beyond a reasonable doubt that defendant was legally sane when he killed Kathleen Pearson, even if he was suffering from a mental disease or defect.

In evaluating defendant's ability to conform his conduct to the requirements of law, the trier of fact must weigh all of the evidence and

determine the credibility of all witnesses. (*People v. Jones* (1982), 109 Ill. App. 3d 120, 126, 440 N.E.2d 261.) The trial court finding will not be disturbed on review unless that finding is so improbable as to raise a reasonable doubt of defendant's sanity. *People v. Brown* (1982), 104 Ill. App. 3d 1110, 1117, 433 N.E.2d 1081.

■ The expert testimony in this case was conflicting: Dr. Adams concluded that defendant could not control his actions on the morning of the killing; Dr. Reifman concluded, on the basis of substantially the same evidence, that defendant could control his conduct that morning. There was no evidence that defendant had been unable to control his conduct at any time during the seven-year period preceding this offense. The lay witnesses indicated that defendant could control his conduct a few days before and a few minutes after he killed Kathleen. We conclude that the trial court's finding that defendant was legally sane is not so improbable that we should disturb it on review.

■ Defendant next contends that his conviction must be reversed because section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 6—2) is unconstitutionally vague in that it does not include a definition of "mental disease" and it requires that the judge "make an impossible distinction between 'mental disease' and 'mental illness.' " However, the trial court found that defendant was able to conform his conduct to the requirements of law; defendant was therefore legally sane regardless of whether he suffered from a mental illness or a mental disease. Since the alleged vagueness of the statute does not affect the outcome of this case, we do not decide whether the lack of a definition of mental disease renders section 6—2 of the Criminal Code unconstitutionally vague.

■ Similarly, defendant argues that section 6—2 is unconstitutional because it deprived him of equal protection of the laws. Under section 6—2, a defendant can be found guilty of a crime even if he is unable to conform his conduct to the requirements of law if that inability is not the result of a mental disease or a mental defect. (Ill. Rev. Stat. 1981, ch. 38, par. 6—2(a).) Defendant claims that the statute denies equal protection to the class of persons who had "mental illnesses" which do not amount to "mental diseases," and who, because of those illnesses, are unable to conform their conduct to the requirements of law. However, the trial court expressly found that defendant was able to conform his conduct to the law, and we have affirmed that finding. Thus, defendant does not fall into the class which has allegedly been denied equal protection. We do not decide whether the statutory scheme might deprive other defendants of equal protection.

■ Defendant claims that the case must be reversed and re-

manded for a new trial because the trial court erroneously admitted into evidence testimony regarding defendant's post-arrest silence. The United States Supreme Court has recently stated:

"The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity. In both situations, the state gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized." (*Wainwright v. Greenfield* (1986), 474 U.S. 284, ____, 88 L. Ed. 2d 623, 630-31, 106 S. Ct. 634, 639, citing *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.)

Our supreme court has similarly held that the *Doyle* principle applies to cases involving an insanity defense. *People v. Stack* (1986), 112 Ill. 2d 301, 306-07, 493 N.E.2d 339.

In the instant case, Officer Maraffino testified that defendant was silent after he was given his *Miranda* warnings. The court overruled defense counsel's prompt objection. Dr. Reifman testified that he based his opinion in part on evidence that defendant did not talk to the police after he was given the *Miranda* warnings. Although defense counsel did not object to Reifman's statement, this issue was sufficiently preserved for review by the objection to Maraffino's testimony. (*Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 589-90, 462 N.E.2d 620.) Following *Wainwright* and *Stack*, we find that the trial court erred in admitting evidence from both Maraffino and Reifman of defendant's post-arrest silence.

■ However, this constitutional error does not require reversal if it is harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828.) In *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485, the defendant pleaded not guilty by reason of insanity and the trial court erroneously admitted evidence of post-arrest silence. Our supreme court reversed the conviction. (113 Ill. 2d 1, 7, 495 N.E.2d 485.) In another section of that opinion, the court reaffirmed the principle that "even though reports made by others may be substantively inadmissible, an expert may utilize them in forming his opinion as long as experts in the field reasonably rely on such materials." (113 Ill. 2d 1, 7, 495 N.E.2d 485.) The court further stated that "an expert should be allowed to reveal the contents of materials upon which he reasonably relies in order to explain the basis of his opinion." (113 Ill. 2d 1, 9,

495 N.E.2d 485.) Although it was error for the trial court to permit Dr. Reifman to refer directly to defendant's silence following *Miranda* warnings, Reifman and Maraffino could have properly testified "that the defendant's behavior appeared to be rational at the time of his arrest" by answering "carefully framed questions that avoided any mention of the defendant's exercise of his constitutional rights to remain silent." (*Wainwright v. Greenfield* (1986), 474 U.S. 284, ____, 88 L. Ed. 2d 623, 632, 106 S. Ct. 634, 640.) We note that in *Wainwright*, the State did not argue that the error was harmless beyond a reasonable doubt. (474 U.S. 284, ____, 88 L. Ed. 2d 623, 633, 106 S. Ct. 634, 641 (Rehnquist, J., concurring).) Since Dr. Reifman could properly testify regarding the basis for his opinion, including the fact that defendant acted in a rational manner shortly after he attacked the Pearsons, we are persuaded that the trial court error in allowing Dr. Reifman to testify regarding defendant's post-arrest silence was harmless beyond a reasonable doubt.

■ Defendant argues that even if he had been legally sane, he should have been found "guilty but mentally ill." If the trial court had held that defendant was guilty but mentally ill, the Department of Corrections would have a statutory obligation to "cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6(b).) It would also be obliged to "provide such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—6(b).) Although the Department of Corrections is obligated to provide minimally adequate medical care for all its inmates, persons who were mentally ill at the time they committed crimes have the further, substantial right to periodic examinations concerning the treatments for their mental illnesses. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 234, 448 N.E.2d 969.) Moreover, persons who were mentally ill at the time they committed crimes have the right to avoid the stigma which society attaches to persons who are found guilty of crimes; they face instead the distinct, not necessarily lesser, stigma attached to persons found guilty but mentally ill. Thus, under appropriate facts, a defendant has the right to a judgment of "guilty but mentally ill" instead of "guilty."

Under section 115—3 of the Code of Criminal Procedure of 1963, the trial court should have entered a judgment of "guilty but mentally ill" if it found beyond a reasonable doubt that defendant was guilty of the offenses charged, and mentally ill, but not legally insane, at the time he committed those offenses. (Ill. Rev. Stat. 1983, ch. 38, par.

115—3(c).) The trial court did not find that defendant was mentally ill; however, it also never expressly found that defendant was not mentally ill. At the hearing on defendant's motion for a new trial, defense counsel challenged "the Court's conclusion that the Defendant is guilty of murder without the description that he was either mentally ill or that he was not guilty by reason of insanity." The court responded:

> "Defendant was not necessarily overwhelmed with sadistic sexual fantasies, but *** he was very definitely obsessed with sadistic, sexual fantasies, over a long period of time ***.
>
> ***[N]o doubt he did have a morbid preoccupation with violence *** and no doubt the alcohol which he ingested *** very likely did *** intensify his—his impulses and fantasies or as he says here, conflictual feelings."

The court concluded, based partly on the opinion of Dr. Reifman, that defendant was able to conform his conduct to the requirements of law, and therefore he was not legally insane. However, the court never directly addressed the contention that defendant was mentally ill.

"Mental illness" is statutorily defined as:

> "[A] substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1981, ch. 38, par. 6—2(d).)

In the instant case, both Dr. Adams, testifying for defendant, and Dr. Reifman, testifying for the State, submitted considerable evidence showing that defendant was suffering from a substantial disorder of mood or behavior which impaired his judgment. Dr. Reifman testified that defendant had suffered from a mental disorder for many years, although that disorder did not constitute a "mental disease" within the meaning of section 6—2 of the Criminal Code. Defendant's extensive history of emotional problems, documented by numerous psychiatrists, provides further evidence of his disorders of thought, mood, and behavior. None of the lay testimony contradicts this evidence. Indeed the nature of the crime, the brutal killing of a complete stranger by a person who had previously conducted himself peacefully, tends to show that the killer suffered from a mood or behavioral disorder which affected his judgment.

The State suggests that the trial court could have believed that defendant suffered from no mental illness at all, and that he at-

tempted to concoct an insanity defense once he was caught in the act. Under this theory, defendant planned his defense some 16 years before he committed his crime, when his documented history of psychological problems began, and he deceived numerous psychiatrists in the intervening years. We find no indication in the record that the trial court accepted this theory. We conclude that the simple judgment of "guilty" is contrary to the manifest weight of the evidence, and we remand for entry of a judgment of "guilty but mentally ill."

With the entry of this judgment, the Department of Corrections will be required to examine defendant to determine his need for treatment. Therefore, the trial court need not hold a separate hearing regarding treatment, as defendant requests in his fifth assignment of error.

■■ Finally, defendant contends that the sentence is excessive. We have held that the trial court entered sentence on an improper judgment. Although the sentences entered by the trial court remain available to that court upon a judgment of guilty but mentally ill (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—6(a)), we cannot determine whether the trial court would have entered those sentences had it entered the proper judgment. Therefore, we remand for resentencing.

Reversed and remanded with directions.

RIZZI, P.J., and McNAMARA, J., concur.