FIFTH DIVISION
March 24, 2006

No. 1-04-0742

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| GLEN DRESHER, | ) | Honorable |
| | ) | Garritt Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE GALLAGHER delivered the opinion of the court:

Following a jury trial, defendant Glen Dresher was convicted of attempted first degree murder and aggravated domestic battery for striking his former wife, Roseanne Dresher, with his car several times in July 2001. The trial court sentenced defendant to 10 years in prison for attempted murder and a consecutive 4-year term for aggravated domestic battery.

On appeal, defendant raises the following contentions: (1) the evidence was insufficient to support the jury's finding that defendant was not mentally ill, and the judgment should be modified to guilty but mentally ill; (2) the State improperly introduced into evidence statements that defendant made while in police custody and after he asserted his right to counsel; (3) the State verbally attacked and disparaged the main expert witness for the defense; (4) the trial court erred in refusing to admit certain defense exhibits that defendant asserts were relevant to his state of mind at the time of the offense and also erred in allowing the State's expert witnesses to review testimony of defense experts; (5) the cumulative effect of those errors prevented a fair

trial; and (6) the trial court should not have imposed consecutive sentences because, according to the indictment, his two convictions were based on the same physical act. For the reasons set forth below, defendant's conviction and 10-year sentence for attempted murder are affirmed. However, we vacate defendant's aggravated domestic battery conviction and sentence.

BACKGROUND

I. General Testimony

The record contains the following facts and testimony relevant to the issues that defendant has raised on appeal, and further facts pertinent to each issue are set out later in this opinion. Defendant and Roseanne wed in 1969 and had two sons and a daughter during their 25-year marriage. Defendant filed for divorce in 1988 after discovering Roseanne's infidelity; however, he later stopped the proceedings. Defendant filed for divorce again in 1994, and the couple's divorce was final in 1997.

On July 19, 2001, defendant called Roseanne to ask if he could bring some insurance forms to her house the next morning that she needed to sign. On July 20, defendant drove to Roseanne's house in Glencoe and parked at the end of the driveway near the street. After defendant honked his car's horn, Roseanne went outside and walked to defendant's car. Roseanne testified that defendant remained seated in his car while she signed the document.

After their conversation, Roseanne turned her back to the car and started walking toward the house. Roseanne testified that she heard the car's motor "rev up" and then was struck from behind and thrown into the air. After he hit her with the car a second time, defendant got out of

the car, approached her as she lay on the ground and said, "Remember, this is only an accident."

Defendant returned to his vehicle and struck Roseanne between five and seven times, getting out of his car again several times to tell her that it was an "accident." Roseanne testified that after the car hit her a fourth time, defendant bent over Roseanne silently before resuming the attack, and she "played dead," hoping that he would stop and leave. Defendant's car struck the house at one point. Roseanne's injuries included multiple rib and pelvic fractures, a fractured wrist and collapsed lungs.

Defendant and Roseanne's daughter, Abra, testified that defendant knew she was in town from California that week to visit her parents and extended family; however, Abra said defendant was not expecting her to be at Roseanne's home on July 20 because she told defendant a few days earlier that she would be gone by July 18 or 19. On the morning of July 20, Abra testified that she was inside when she heard the house shake. Standing at the top of the stairs, Abra saw defendant enter the house, pick up the telephone, dial a number and replace the receiver. Defendant went back outside, and Abra followed him and saw Roseanne on the ground. Defendant was sitting in his car and Abra testified he looked "agitated" and "very pale."

After Abra went inside and called 911, she returned to the driveway, where she confronted defendant and they pushed and hit each other. Defendant told Abra several times that it was an "accident." Defendant got back in his car and accelerated forward while Abra stood in front of the car to stop him. Abra testified that when she reached into defendant's vehicle for his car phone to dial 911 again, defendant pulled the phone away from her reach.

Both Roseanne and defendant testified about their sons, Jason and Jonathon, who both

suffer from mental disabilities. Jason was diagnosed as autistic and mentally disabled at age 3 or 4 and has lived since age 11 at St. Colletta's, a residential facility in Wisconsin. Their younger son, Jonathon, was hospitalized for several weeks in 1999 while attending college in Pennsylvania and was diagnosed as psychotic and suicidal.

Defendant testified that although he made a good living in his family's furniture business and other jobs, Roseanne spent money excessively during their marriage and that their arguments about money affected their relationship "in a bad way." Defendant said Roseanne was embarrassed by Jason's condition and that she had called their son "a lost cause." After their divorce, defendant paid Roseanne $9,000 a month in maintenance.

The defense raised an insanity theory, arguing that defendant did not appreciate the wrongfulness of his conduct. Defendant testified that he "started to hear voices" in January 2001; about three times a day, he heard a male voice call him a "failure" and "loser" and make similar denigrating comments. Defendant would walk in a circle to try to "quiet" the voices. However, he did not seek medical treatment or tell anyone about the voices because he "didn't want to be institutionalized" and he "thought [he] could handle it himself." Defendant said he attempted suicide twice in the spring of 2001 by turning on his car's engine with the garage door closed. Defendant testified that in July 2001, the voices became louder and more frequent, and on one occasion, he yelled at Abra and Jonathon while at dinner.

Regarding the day of the incident, defendant said he heard voices as he drove to Roseanne's house. Defendant said he was not angry with Roseanne that day and did not intend to harm her. After Roseanne signed the insurance form, defendant put the car in reverse,

4

intending to back out of the driveway.  Defendant next recalled seeing Roseanne on the ground and did not remember striking her with the car or telling her it was an "accident."  Defendant remembered going inside the house and dialing 911, and he said he saw Abra at the top of the stairs.  Defendant said he went back outside but does not remember arguing or struggling with his daughter.  Defendant said he continued to hear voices while Glencoe police handcuffed him.

On cross-examination, defendant admitted that he never told his longtime personal physician that he needed psychiatric help and that he did not seek such help until after he was charged in the instant case.  (He later stated he saw a psychiatrist in 2000.)  Defendant said that aside from the incident involving Roseanne, he had experienced no other memory loss. Defendant acknowledged that he had a bad temper and that he was hurt and angry when he discovered his wife's infidelity.

## II.  Expert Testimony Regarding Defendant's Mental Health

Because defendant contends on appeal that the evidence was sufficient to prove him guilty but mentally ill, we review the testimony that pertained to defendant's mental state.  Four doctors testified on defendant's behalf, with several of them stating that defendant's premature birth affected his mental and physical development.  Dr. Richard Abrams treated defendant 20 or 30 times beginning in August 2001, about two weeks after the incident.  The trial court found that in addition to being defendant's treating psychiatrist, Dr. Abrams was qualified to testify as an expert in psychiatry.  Defendant told Dr. Abrams that Roseanne treated him as a "meal ticket" and told defendant she would divorce him if he did not give her enough money and provide

certain items such as an in-ground swimming pool at their home. Dr. Abrams testified that Roseanne's demands reinforced in defendant feelings of inadequacy that were rooted in his childhood, and defendant's discovery of her infidelity compounded those thoughts. In early 2001, defendant began to have feelings of self-doubt and depression, specifically that he was worthless and no one loved him or cared about him.

As to defendant's mental status at the time of the incident, Dr. Abrams testified that defendant likely had an "acute psychotic episode," during which a person is "on the edge" due to alcohol or drug use or mental status. The doctor stated that defendant was not under the influence of drugs or alcohol in July 2001; his actions were triggered by childhood experiences and other stressors. Dr. Abrams testified that defendant had a mental illness – a "major depression" – and was "borderline psychotic" at the time of the incident such that he could not appreciate the criminality of his conduct. The doctor based his opinion on defendant's "inability to relate" throughout his life, his lack of friends and his inability to express his feelings.

On cross-examination, Dr. Abrams stated that defendant did not express remorse for hitting Roseanne.[1] Defendant had suicidal thoughts but did not consider a specific method of killing himself. Dr. Abrams acknowledged that the symptoms that defendant exhibited were common in malingering patients, who lie about their condition, and he suspected defendant of

---

[1] Defendant testified that although he did not remember hitting Rosanne with his car, he gleaned knowledge of the incident from media reports and police reports, and his answers to the questions of Dr. Abrams and other treating doctors were based on those sources.

exaggerating his symptoms. Dr. Abrams described defendant's psychiatric condition as follows:

"A severe degree of repression, such that he is not in touch with his feelings, his impulses to any large extent. I do believe there's a lot of hatred in there that I think is not properly processed as ideally as a normal person would do, and I think he's extremely depressed which doesn't show on the surface but if one looks carefully, one can see it.

And I think he's very much down on himself and feels like an absolute nothing, terrible self esteem, riddled with all kinds of feelings of deficiencies, inadequacies in every way, shape or form physically, mentally, financially."

Dr. Michael Stone, a clinical psychologist, testified for the defense as an expert in the field of psychology. As Dr. Abrams had, Dr. Stone testified that defendant was unable to appreciate the criminality of his conduct when he hit Roseanne with his car. Dr. Stone evaluated defendant as suffering from major "recurrent" depression "with severe manifestations of anxiety and agitation" and also as having "borderline personality disorder." Dr. Stone based his opinion on, among other factors, defendant's childhood rejection by his parents, his "difficulty getting his act together" regarding employment, and his unhappy marriage. Dr. Stone also noted defendant's fatherhood of two mentally impaired children, stating that mental disorders can be hereditary.

Dr. Stone's impression of defendant's mental health echoed Dr. Abrams' assessment, *i.e.*, defendant was depressed and lacked self-esteem. Defendant told Dr. Stone he had considered three ways of committing suicide and described those methods. However, defendant's scores on

two standardized tests indicated that defendant was malingering and had "given up" on life. The doctor described defendant as not "day-to-day schizophrenic or psychotic" but as having the "ability" to experience a psychotic episode. On cross-examination, Dr. Stone said defendant told him that when he hit Roseanne with his car, he "heard some voices" and blacked out.

Dr. Norman Kohn testified as an expert in neurology and was retained by the defense to do a neurological examination of defendant in 2002. Dr. Kohn testified that the physical portion of the test revealed that defendant had imperfect vision and unusually fast reflexes. On a problem-solving portion of the test intended to measure defendant's mental abilities, defendant offered "peculiar" responses, according to the doctor.

Dr. Kohn ordered several brain scans, including an EEG, which measures the brain's electrical activity and which revealed that defendant had "a mild and generalized disturbance" in the area of his brain that processes language and emotion. The other two brain tests produced normal results. Dr. Kohn testified that when defendant struck his former wife with his car, he experienced an "intense stress" and was not thinking clearly or logically or acting to complete a plan. On cross-examination, Dr. Kohn said defendant told him that he started hearing voices in 1999 after Jonathon's mental illness emerged, although the doctor acknowledged that defendant told other doctors that he started hearing voices in 2001.

Dr. Kohn referred defendant to Dr. Mark Moulthrop, a clinical psychologist, who also testified at trial. Dr. Moulthrop could not offer an opinion on defendant's sanity at the time of the offense, and his testimony about defendant's mental abilities and anger management generally echoed that of Drs. Stone and Kohn. Dr. Moulthrop testified that tests performed on

defendant showed no signs of a massive brain injury.

In rebuttal, the State called Dr. Dawna Gutzmann and Dr. Mehul Mankad as experts in forensic psychiatry who both concluded defendant was legally sane when he struck his former wife with his vehicle. Both doctors based their opinions on interviews with defendant and their review of the reports of Drs. Abrams and Stone. The State witnesses testified that defendant's symptoms were not consistent with a mental illness, although defendant had signs of major depression. Both doctors testified that defendant was malingering to avoid responsibility for his criminal act. The State also presented the testimony of a neurologist, Dr. Daniel Barnett Hier, who reached a similar conclusion.

At the close of evidence, the jury was instructed on four possible verdicts as to both offenses: guilty, guilty but mentally ill, not guilty by reason of insanity, or not guilty. Rejecting the insanity and mental illness theories, the jury found defendant guilty of attempted first degree murder and aggravated domestic battery.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant contends that the evidence established that he was guilty but mentally ill and, therefore, this case should be remanded for resentencing on that verdict. If a defendant is not insane but suffered from a mental illness at the time of the offense, the defendant may be found guilty or mentally ill; however, that finding does not relieve the defendant of criminal responsibility for his conduct. 720 ILCS 5/6-2(c) (West 2002). As the jury in this case was

instructed, mental illness is defined as "a substantial disorder of thought, mood, or behavior which afflicted a person" when the offense was committed "and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior." 720 ILCS 5/6-2(d) (West 2002). The defendant bears the burden of presenting evidence of mental illness and proving his illness by a preponderance of the evidence. *People v. Lantz*, 186 Ill. 2d 243, 255, 712 N.E.2d 314, 320 (1999) (recognizing that the defense, and not the State, generally will introduce evidence of defendant's mental condition).

If a trier of fact returns a verdict of guilty, rather than guilty but mentally ill, a reviewing court will not reverse that determination on appeal unless the verdict is so improbable or unsatisfactory as to raise a reasonable doubt about the defendant's mental illness at the time of the offense. *People v. Johnson*, 146 Ill. 2d 109, 132, 585 N.E.2d 78, 88 (1991). Defendant, while acknowledging that deferential standard of review, touches on portions of the testimony of his expert witnesses and the State's witnesses, and he argues the experts "agreed that [he] was mentally ill." This is plainly incorrect. Dr. Abrams and Dr. Stone, who testified on defendant's behalf, stated that he was unable to appreciate the criminality of his conduct, which is the test for insanity, not mental illness. Mental illness means the defendant's judgment was impaired but not so much that he does not appreciate the wrongfulness of his behavior. See 720 ILCS 5/6-2(a), (d) (West 2002). Furthermore, defendant's own treating psychiatrist testified that he suspected defendant of malingering.

In addition, the three doctors who testified for the prosecution stated that defendant did not display signs of mental illness. Defendant nevertheless argues that all of the expert witnesses

concluded "in some fashion" that he was mentally ill.  Even if this was an accurate statement, which it is not, it was the jury's role as the trier of fact to evaluate the testimony of the expert witnesses and assess their credibility, and the jury was not obligated to accept the opinions of defendant's expert witnesses over those opinions presented by the State.  *People v. Horne*, 247 Ill. App. 3d 192, 198, 617 N.E.2d 240, 245 (1993); *People v. Kluxdal*, 225 Ill. App. 3d 217, 224, 586 N.E.2d 701, 707 (1991).

Defendant's reliance on *People v. Gurga*, 150 Ill. App. 3d 158, 501 N.E.2d 767 (1986), is similarly misplaced.  In that case, the trial court, as the trier of fact, found that the defendant was not legally insane but did not directly address the defendant's contention that he was mentally ill. *Gurga*, 150 Ill. App. 3d at 166-67, 501 N.E.2d at 774.  Reviewing the testimony about the defendant's psychological problems, this court found that the trial court's finding of guilty was contrary to the manifest weight of the evidence, and the case was remanded for the entry of a "guilty but mentally ill" judgment.  *Gurga*, 150 Ill. App. 3d at 167-68, 501 N.E.2d at 774.  Here, in contrast, the jury was instructed on the definitions of legal insanity and mental illness and rejected both theories, and its conclusion is supported by the testimony described above.

Defendant further asserts that the State "conceded" that the jury could find that he suffered from a mental illness at the time of the offense.  Defendant cites the prosecutor's comments, made in closing argument, that it was "possible that you could find that the defendant was suffering from a mental illness" at the time of the offense and that "everybody said he was mentally ill, I guess, most of them."  Recognizing in closing argument that the jury could agree with the defense's case does not constitute a concession or admission, particularly when the

prosecutor then argued that even if the jury accepted the testimony about defendant's mental state, the jury was required to determine if the evidence met the legal requirement for mental illness.

Defendant also challenges what he characterizes as the State's unsupported assertion that depression is not a mental illness. Having reviewed the State's brief, we note that the State does not assert that depression can *never* constitute a mental illness as defined by section 6-2(d) of the Criminal Code of 1961 (720 ILCS 5/6-2(d) (West 2002)). Rather, the State contended that the evidence presented as to defendant's depression was insufficient to establish that he was guilty but mentally ill. In conclusion, the evidence was sufficient to support the jury's verdict that defendant was guilty of the charged offenses and its rejection of the verdict of guilty but mentally ill.

II. Defendant's Postarrest Statements

Defendant next argues that the State improperly introduced into evidence statements that he made while in police custody and after he had asserted his right to counsel, and he contends that this court must reverse his conviction and remand for a new trial.

Before trial, the defense moved *in limine* to bar the State from introducing evidence of defendant's responses to questions from police after he had invoked his right to counsel. The State argued that defendant's responses established that he was coherent and rational after his arrest and therefore were admissible to counter defendant's insanity theory. Over defense counsel's objection, the trial court allowed the State to present evidence as to defendant's

demeanor after his arrest; however, the court cautioned the State not to explore specific questions or responses.

Defendant contends that despite the court's ruling, the State impermissibly introduced questions asked of defendant after his arrest and the responses defendant gave. In the State's rebuttal case, Glencoe police lieutenant Elizabeth Seno testified that after she arrested defendant in the driveway of his former wife's home, she seated defendant in her police vehicle and asked him if he was on any medications or if he intended to harm himself. (Defendant responded no to both questions.) When Lieutenant Seno was asked if she posed those questions to all arrestees, she responded that she was "just concerned for [defendant's] safety." Lieutenant Seno also testified that defendant "did exactly what I told him to do."

We initially observe that although the defense raised the claimed error in its posttrial motion, counsel did not object at trial to Lieutenant Seno's testimony. Issues raised on appeal are preserved for review by objecting during trial and filing a written posttrial motion raising the alleged error. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Defendant argues that he "mounted an objection prior to trial," which, coupled with his posttrial motion, preserved his issue for appeal. However, the denial of a motion *in limine* does not excuse a failure to object to evidence introduced at trial; " '[t]he moving party remains obligated to object contemporaneously when the evidence is offered at trial.' " *Krklus v. Stanley*, 359 Ill. App. 3d 471, 486, 833 N.E.2d 952, 965 (2005), quoting *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502, 645 N.E.2d 896 (1994). For that reason, defendant has forfeited his ability to raise this argument on appeal.

III.  Testimony of Dr. Abrams

Defendant's next contention is that a new trial is warranted because the State launched several inappropriate verbal attacks during the testimony of Dr. Abrams, who was defendant's treating psychiatrist and the defense's main expert witness.  Defendant first argues that the prosecutor impugned the doctor's professional integrity by suggesting he had violated the Hippocratic oath.  Defendant's contentions involve the following exchange during Dr. Abrams' cross-examination:

"MR. MOORE [Assistant State's Attorney]: Doctor, isn't it the Hippocratic oath – did you take the Hippocratic oath?

A. I imagine a long time ago.

Q. Yes?

A. When I graduated from medical school.

Q.  Is that a yes?

A.  Yes.

Q. As part of that Hippocratic oath, Doctor, something to the effect that above all else do no harm to the patient?

MR. CUTRONE [defense counsel]: Objection to that, Judge.  Where is there evidence that he is doing harm to the patient?  This is getting outrageous.

THE COURT: Gentlemen, don't argue your objections.  I want an objection followed by a legal basis with nothing else.  Objection is overruled.

Q. Do you remember the question, Doctor?

A. I'm sorry.

Q. The Hippocratic oath. Isn't there a section in there, that above all else do no harm. It might be in Latin.

A. That's correct.

Q. That's important as a treating physician to follow that rule?

A. Correct.

Q. Just like it's important when you're testifying as an expert to tell the truth no matter what?

A. Correct."

Defendant asserts that the trial court compounded the error when it overruled defense counsel's objection and that the State further emphasized the testimony in its rebuttal closing argument, when the prosecutor stated:

"You heard from Doctor Abrams who went on and on and on, and it is almost as important of [*sic*] what he didn't tell you as what he did tell you.

Some of you may wonder whether or not Doctor Abrams has a driver's license, not to mention a medical license. He didn't appear to be prepared to testify. He didn't appear to know his notes. He didn't appear to know what was in his reports.

MR. CUTRONE: Objection, Judge.

THE COURT: Overruled. Counsel may argue."

Although the cross-examination of Dr. Abrams was vigorous and clearly contentious at times, our review of the above testimony does not reveal that the State suggested while cross-examining the doctor that he had violated his professional oath. Rather, the prosecutor analogized the Hippocratic oath that medical professionals take to the sworn oath of witnesses in a court proceeding to offer truthful testimony.

As to the prosecutor's remarks in rebuttal closing argument, it is well established that the State is afforded wide latitude in closing argument, and the trial court is vested with the discretion to determine the proper character and scope of those statements. *People v. Baugh*, 358 Ill. App. 3d 718, 741, 832 N.E.2d 903, 922-23 (2005). The comments made in closing argument reveal that the prosecution questioned the basis for and the believability of Dr. Abrams' testimony, and the credibility of a witness is a proper focus of closing argument if it is based on the evidence or reasonable inferences drawn from the evidence. *People v. Hickey*, 178 Ill. 2d 256, 291, 687 N.E.2d 910, 926-27 (1997).

Moreover, a prosecutor's comments must be considered in the context of the parties' arguments as a whole and their relationship to the evidence (*People v. Hall*, 194 Ill. 2d 305, 350, 743 N.E.2d 521, 546 (2000)), and comments invited by a defense argument and which are not prejudicial do not constitute error. *People v. Szudy*, 262 Ill. App. 3d 695, 710, 635 N.E.2d 801, 811 (1994). Before the State made the complained-of comments in its rebuttal closing argument, the defense offered similar remarks in its own closing argument, essentially apologizing for portions of Dr. Abrams' testimony.[2] We find no prejudice to defendant from the prosecution's

---

[2] In closing argument, defense counsel stated about Dr. Abrams:

cross-examination of the doctor or its statements in closing argument.

Defendant further asserts it was improper for the prosecutor to ask Dr. Abrams why he did not interview defendant's children. The record reveals that after defense counsel objected, the trial court heard counsel's arguments in a sidebar discussion and overruled the defense's objection, and the trial court was within its discretion to do so. Defendant also argues that the State erred by asking Dr. Abrams about another case in which he offered expert testimony and asking the doctor at another point if defendant told him about an affair he had. As to the prosecutor's reference to another case, the defense did not object at trial, thereby forfeiting defendant's argument on appeal. Regarding whether defendant suffered prejudice when Dr. Abrams was asked if defendant told him about an affair, the trial court sustained defense

---

"He wasn't selected because he was a great expert witness. He wrote reports. He can't get the proper dates on the reports because he doesn't change them in his computer. And the notes you have you can barely read. He is sloppy with dating. *** Glen Dresher is not legally sane because his treating physician is sloppy."

counsel's objection and ordered the State not to pursue that topic and to begin another line of questioning, which the prosecutor did. Defendant was not prejudiced when the jury heard the lone reference to an affair.

As a final argument in this vein, defendant asserts he was prejudiced when Dr. Abrams stated during cross-examination that he was "not the best" at resolving certain issues, and the prosecutor responded, "We agree." Defendant contends that despite the prosecutor's subsequent apology for the remark and request to withdraw it, the jury nevertheless heard the exchange, as with the single reference to defendant's extramarital affair. Although it is axiomatic that the prosecutor or the court cannot "unring the bell," we cannot conclude that this comment prejudiced defendant, especially in light of the defense's own remarks regarding Dr. Abrams in its closing argument. In summary, the prosecution's cross-examination of Dr. Abrams and its remarks in rebuttal closing argument did not result in prejudice to defendant such that a new trial is required.

IV. Relevance of Items Offered as Defense Exhibits

Defendant next claims that the trial court erred in excluding a number of exhibits. During direct examination of defendant, defense counsel sought to introduce numerous items into evidence, including: (1) a typed agreement between defendant and Roseanne in 1983 that he would have an in-ground swimming pool installed if Roseanne agreed to decrease her personal spending; (2) a note handwritten and signed by Roseanne in 1988 in which she agreed to limit her spending to $5,000 per month; (3) a copy of a classified ad in which Roseanne sought an

extramarital partner; (4) pages from Roseanne's diary detailing her affair; and (5) various love letters between Roseanne and her partner.

After defense counsel requested admission of the first two items, the court ruled, after a sidebar discussion, that the defense had not established their relevance, and the court sustained the State's objection to the entry of the items into evidence. Defendant's attorney then asked defendant about the other items described above, over numerous successful State objections. Defendant testified that he felt "devastated and betrayed" by his wife's infidelity, which he discovered through the latter items, prompting him to file for divorce in 1988. At the close of evidence, defense counsel offered the latter exhibits for admission, and the trial court again sustained the State's objection to the items based on relevance.

On appeal, defendant contends that the court's ruling on the exhibits prohibited him from presenting a defense. He argues that the exhibits were relevant to illustrate his state of mind, which was his main theory of defense, and that they also supplemented Dr. Abrams' testimony that defendant was embarrassed, hurt and depressed after learning of Roseanne's infidelity.

Evidence is admissible if it is relevant, meaning it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Camco, Inc. v. Lowery*, 362 Ill. App. 3d 421, 433, 839 N.E.2d 655, 665 (2005) (further noting that "evidence is probative when to the normal mind it tends to prove or disprove a matter at issue"). This court will not disturb the trial court's ruling concerning the admission of exhibits into evidence absent a finding of abuse of discretion. *People v. Davis*, 322 Ill. App. 3d 762, 765, 751 N.E.2d 65, 67 (2001). The defense's

19

theory at trial was that defendant was insane and could not appreciate the wrongfulness of his

conduct when he struck Roseanne with his car in 2001, which was four years after their divorce.

The materials at issue were probative of defendant and Roseanne's marital discord and why

defendant filed for divorce in 1988, approximately 13 years before he injured Roseanne.

Contrary to defendant's argument, the items were not relevant to defendant's state of mind at the

time of the offense, and the trial court did not abuse its discretion in excluding them from

evidence.

V.  Expert Witnesses Presented in State's Rebuttal Case

Defendant next asserts that the trial court erred in allowing the State to provide its expert

witnesses with transcripts of the testimony of defendant's experts.  During the defense case, the

State asked that their expert witnesses who would testify in rebuttal be allowed to review

transcripts of the defense experts' testimony.  The court permitted it over a defense objection.

Defendant now compares that ruling to the court's pretrial order excluding witnesses (most

notably defendant's mother) from the courtroom, and he asserts that the trial judge "took a

different position" in allowing the State's experts to review the testimony of the defense experts

in preparation for their appearances in the prosecution's rebuttal case.

Defendant's contention intertwines two distinct issues, which we consider separately.

We first briefly note, as to the court's pretrial ruling, that the court has the discretion to exclude

witnesses from the courtroom during a trial.  *In re H.S.H.*, 322 Ill. App. 3d 892, 896, 751 N.E.2d

1236, 1241 (2001) (observing, however, that no statute or supreme court rule requires such

exclusion).  Excluding a witness is an appropriate measure intended to preclude, intentionally or

not, a witness's shaping of his or her testimony to conform to that of witnesses who have already testified; to the same end, the court can instruct witnesses not to discuss their testimony with others who will testify. *H.S.H.*, 322 Ill. App. 3d at 896, 751 N.E.2d at 1241. Defendant acknowledges these tenets but asserts that the trial court created a exemption to its own exclusionary order by allowing the State's experts to review the defense experts' testimony by reviewing transcripts. He argues that this ruling essentially contradicted the court's earlier exclusion-of-witnesses ruling by enabling the State's experts to hear the defense's experts' testimony.

This raises the second issue: whether experts can review testimony of the opposition's experts in preparation for their own testimony. As the State points out, rebuttal testimony is offered to explain, repel, contradict or disprove evidence presented by the opposing party. *People v. Henney*, 334 Ill. App. 3d 175, 187, 777 N.E.2d 484, 495 (2002). The trial court retains the discretion as to whether to allow rebuttal evidence, and with most other evidentiary rulings, the court's determination will not be disturbed absent a clear abuse of that discretion. *Henney*, 334 Ill. App. 3d at 187, 777 N.E.2d at 495. Explaining issues raised by the testimony of the defense's experts was a proper subject for rebuttal testimony of the State's experts. See, *e.g.*, *Lagestee v. Days Inn Management Co.*, 303 Ill. App. 3d 935, 942, 709 N.E.2d 270, 276 (1999).

Defendant also seems to argue that the State should not have been allowed to present expert testimony in rebuttal that criticized or questioned the testimony of the defense's experts, asserting that the prosecution's experts' opinions of the defense experts' testimony "did not constitute proper medical opinion evidence." Defendant argues that it was "error" for the State's

experts to comment on the testimony of their defense counterparts, and he contends it was the jury's task "to determine whether the defense experts were credible." The jury heard the testimony of both the State and defense experts and chose to find the former witnesses more persuasive, and as defendant himself notes, the jury was the ultimate arbiter of credibility. In summary, the trial court properly excluded potential witnesses from the courtroom during trial, and furthermore, the trial court did not err in allowing the State's experts to review transcripts of the defense witnesses' testimony before the State experts testified in rebuttal.

## VI. Cumulative Error

Defendant contends that the combined effect of the errors at trial and the introduction of prejudicial evidence deprived him of a fair trial. While individual trial errors may have the cumulative effect of denying a defendant that right, no such accumulated error occurs where none of the separate claims amounts to reversible error. *People v. Moore*, 358 Ill. App. 3d 683, 695, 832 N.E.2d 431, 442 (2005). Because we have rejected each of defendant's arguments, as set out above, his cumulative error argument necessarily fails as well.

## VII. Imposition of Consecutive Sentences

Defendant's final contention on appeal is that his convictions and consecutive sentences for attempted murder and aggravated domestic battery violate the "one-act, one-crime" rule because both crimes were based on his act of striking his former wife with his car. Defendant argues that because the indictments for the counts of attempted murder and aggravated domestic

battery alleged the same physical act, using identical language in each count (*i.e.*, defendant "struck Roseanne Dresher with his car"), the State alleged that both offenses arose from the same physical act. Defendant therefore asks this court to vacate his conviction and sentence for aggravated domestic battery, the less serious of the two charges.

During defendant's sentencing hearing, the trial court considered whether it could impose consecutive sentences for his two convictions. The prosecutor told the court that the State's position was that "the two counts merge into each other." The court, discussing several appellate court cases, ruled that because defendant hit Roseanne with his vehicle multiple times and got out of his car between strikes, consecutive sentences were permitted, and the court imposed consecutive sentences for the two offenses.

Our review of this issue is *de novo*. *People v. Peacock*, 359 Ill. App. 3d 326, 331, 833 N.E.2d 396, 400 (2005). Defendant asserts that under *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977), more than one conviction cannot be based on the same physical act. Under *King*, the key consideration is whether a single physical act took place or multiple acts occurred; if multiple acts occurred, multiple convictions can be supported unless the acts involve lesser included offenses. *King*, 66 Ill. 2d at 566, 363 N.E.2d at 844-45. "Multiple convictions are improper only where there is a single physical act or the convictions arise from lesser included offenses." *People v. Pearson*, 331 Ill. App. 3d 312, 321-22, 770 N.E.2d 1183, 1192 (2002), citing *People v. Rodriguez*, 169 Ill. 2d 183, 186, 661 N.E.2d 305 (1996).

Numerous cases have focused on the initial inquiry posed in *King*: Did one act take place or did several acts occur so as to support multiple convictions? Defendant argues that his attack

on his former wife constituted a single act. The State asserts that the incident "was comprised of multiple acts separated by significant intervening events," meaning when defendant got out of his car and approached Roseanne.

We immediately distinguish this case from those in which the defendant was charged with more than one offense for committing one act (as opposed to a series of closely spaced acts). See, *e.g.*, *People v. Harvey*, 211 Ill. 2d 368, 391, 813 N.E.2d 181, 196 (2004) (defendant could not be simultaneously convicted of four counts of unlawful possession of motor vehicle and one count of aggravated possession of three or more stolen vehicles within one-year period); *People v. Pulgar*, 323 Ill. App. 3d 1001, 1012, 752 N.E.2d 585, 593-94 (2001) (convictions for aggravated battery and commission of a hate crime both could not stand when each was based on defendant's striking victim with vehicle). Compare *People v. Harris*, 182 Ill. 2d 114, 133-34, 695 N.E.2d 447, 457 (1998) (first degree murder and attempted armed robbery convictions could stand, though based on same incident, when defendant fired two shots at victim).

In contrast to *Harvey*, *Pulgar* and similar cases, the facts presented here are more akin to those in *Harris* and in *Crespo*, in which the defendant stabbed the victim three times "in rapid succession." *People v. Crespo*, 203 Ill. 2d 335, 338, 788 N.E.2d 1117, 1119 (2001). The supreme court in *Crespo* discussed the "multiple acts" test from *King* and noted, in examining the indictment, that while the separate acts of stabbing the victim could support discrete offenses, the State did not argue that the separate acts of stabbing individually constituted different crimes. *Crespo*, 203 Ill. 2d at 342, 788 N.E.2d at 1121. The supreme court further noted that the counts of the indictment charging the defendant with armed violence and aggravated battery did not

differentiate between the separate stab wounds. *Crespo*, 203 Ill. 2d at 342, 788 N.E.2d at 1121.

Though the supreme court was careful to note that the State could have charged the stab wounds

as support for three separate counts of aggravated battery and argued the case to the jury in that

manner, the court would not "allow the State to change its theory of the case on appeal." *Crespo*,

203 Ill. 2d at 344, 788 N.E.2d at 1122.[3] The supreme court in *Crespo* also acknowledged that

the appellate court has developed a six-part test that considers factors such as prosecutorial

intent; however, the court found it was "unnecessary" to adopt that test given its disposition of

the appeal. *Crespo*, 203 Ill. 2d at 342, 788 N.E.2d at 1122.

Since the parties submitted their appellate briefs in this case, this court has decided an

appeal that presents essentially identical facts and arguments as those in the case at bar. In

*People v. James*, 362 Ill. App. 3d 250, 251-52, 839 N.E.2d 1135, 1136-37 (2005), the defendant

was convicted of attempted murder and aggravated domestic battery. Evidence was presented

that the defendant stabbed the victim numerous times, including three times each in the neck and

the stomach and once each in the chest, back, arms and legs. *James*, 362 Ill. App. 3d at 251, 839

---

[3] The supreme court recently distinguished *Crespo* in a case where the defendant was

convicted of four counts of criminal sexual assault and four counts of aggravated criminal sexual

assault. In *People v. Bishop*, 218 Ill. 2d 232, 245-46 (2006), the court held that, unlike the

prosecution in *Crespo*, the State consistently treated the charges as separate acts. However, the

court went on to vacate the criminal sexual assault convictions as lesser included offenses of the

aggravated criminal sexual assault counts. *Bishop*, 218 Ill. 2d at 249.

N.E.2d at 1137. The indictments charging the defendant with attempted murder and aggravated domestic battery each stated that the defendant "repeatedly stabbed [the victim] with a knife." *James*, 362 Ill. App. 3d at 252, 839 N.E.2d at 1137. The trial court sentenced defendant to 30 years for attempted murder and a consecutive 7-year term for aggravated domestic battery. *James*, 362 Ill. App. 3d at 253, 839 N.E.2d at 1138.

On appeal, the defendant in *James* argued that his aggravated domestic battery conviction should be vacated under the one-act, one-crime rule. This court agreed, concluding that as in *Crespo*, the defendant "committed a series of closely related but separate acts" in stabbing the victim; however, the State did not treat each stab wound as support for a separate crime. *James*, 362 Ill. App. 3d at 256, 839 N.E.2d at 1140. Because the State did not charge the defendant's actions as multiple acts, multiple convictions could not be sustained, and the court therefore vacated the defendant's conviction on the less serious offense of aggravated domestic battery. *James*, 362 Ill. App. 3d at 256, 839 N.E.2d at 1140.

In the case at bar, the State admits that, as in *Crespo*, the indictment here did not specify which strike was the basis of each charge against defendant (that also was the case in *James*) or indicate that the victim was struck multiple times. Furthermore, the State concedes that at sentencing, the prosecutor told the trial court that defendant's two convictions merged. The State further acknowledges that the prosecution, in its opening statement and closing argument, vacillated between the positions that both convictions were proper because defendant's strikes with his car constituted separate events, and, alternatively, that defendant engaged in a single act by hitting his former wife with his vehicle. Additionally, the prosecutor's statements at

26

sentencing indicated that the State intended to treat defendant's actions as support for one offense.

However, the State contends that *Crespo* is distinguishable because the stabbings in that case occurred "in rapid succession with no intervening acts" to set them apart as distinct actions. The State analogizes the facts here to those in *Harris*, where the defendant's two shots at the victim supported separate convictions for first degree murder and attempted armed robbery. *Harris*, 182 Ill. 2d at 133-34, 695 N.E.2d at 457. The State asserts that the *Harris* court did not indicate the indictments specifically identified the respective gunshots, and therefore the indictments in this case also did not have to identify a particular blow to the victim with defendant's vehicle in support of each count.

The State's reference to defendant's exiting his car between strikes as an "intervening event" in the incident leads us to revisit the six-factor test previously mentioned. The supreme court recognized the test in *Crespo* but hesitated to apply it, instead basing its decision on the content of the indictment. Since *Crespo*, the supreme court acknowledged in *People v. Sienkiewicz*, 208 Ill. 2d 1, 7-8, 802 N.E.2d 767, 772 (2003), that *King* contained the "guiding principle on this issue," but nevertheless applied the six-part test, which finds these factors relevant to whether one act or multiple acts occurred: (1) whether the defendant's actions were interposed by an intervening event; (2) the time interval between the successive parts of the defendant's conduct; (3) the identity of the victim; (4) the similarity of the acts performed; (5) whether the conduct occurred in the same location; and (6) the prosecutorial intent, as shown by the language of the charging instruments. The last factor is significant "in determining whether

the defendant's conduct constituted separate acts capable of supporting multiple convictions." *Pulgar*, 323 Ill. App. 3d at 1011, 752 N.E.2d at 593-94.

We again note that the prosecution and defense counsel agreed at sentencing that defendant's convictions "merge[d] into each other" for sentencing purposes. The State admits that the indictment did not apportion the strikes with defendant's car among the various offenses with which defendant was charged, and the five remaining considerations all weigh in defendant's favor as well. Defendant committed the same act of striking his former wife with his vehicle several times within a few minutes, she was the sole victim, and the events occurred in the same area. Even if we agreed with the State that defendant's exiting his car between strikes and approaching his former wife constituted an "intervening event" that would support a finding of multiple acts, the previous four factors, coupled with the prosecutorial intent as reflected both in the indictment and the State's arguments to the trial court, compel our conclusion that defendant's convictions were based on one physical course of conduct. Accordingly, we vacate defendant's conviction and sentence for the less serious of the two offenses, aggravated domestic battery. See *People v. Lee*, 213 Ill. 2d 218, 226-27, 821 N.E.2d 307, 312 (2004).

CONCLUSION

For all of the reasons stated herein, we affirm defendant's attempted murder conviction and its 10-year sentence and vacate his conviction and sentence for aggravated domestic battery.

Affirmed in part; vacated in part.

O'BRIEN and NEVILLE, JJ., concur.

28