# Illinois Official Reports

## Appellate Court

---

### *People v. Brewer*, 2018 IL App (1st) 160155

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRYANT BREWER, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-0155 |
| Filed | September 27, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-14226; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Meredith N. Baron, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices Gordon and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial, defendant Bryant Brewer was found guilty of the first degree murder of Chicago police officer Thor Soderberg; the attempted first degree murder of Officers Lynn Casey and Kimberly Thort, Sergeant Jason Kaczynski, and Richard Mints; disarming of a peace officer; and armed robbery while personally discharging a firearm. The trial court subsequently sentenced defendant a term of natural life for the first degree murder and a total term of 115 years for the remaining convictions.

¶ 2    Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that Officer Soderberg was killed "during the course of performing his official duties," and his sentence for natural life must be vacated and remanded for resentencing. Defendant also asserts that if this court vacates his natural life sentence, then his extended sentences for attempt first degree murder must also be vacated and remanded for a term within the Class X range of 6 to 30 years.

¶ 3    We discuss only the facts relevant to the issues raised on appeal and as necessary to detail the circumstances of the offenses. The following evidence was presented at defendant's July 2015 bench trial. Officer Soderberg was assigned to the police academy, but on occasion he received different assignments. On July 7, 2010, Detective Phil Visor had been partnered with Officer Soderberg for their shift. Detective Visor was also usually assigned to the police academy, but on that day, he and Officer Soderberg were assigned to Operation Project Youth, to help children get to and from school safely. Their assignment was based out of the seventh district police station, located at South Racine Avenue and West 61st Street in Chicago.

¶ 4    At approximately 3:40 p.m., about an hour before the end of their shift, Detective Visor dropped Officer Soderberg off at the south parking lot of the seventh district station. Officer Soderberg was to attend a volleyball game at the police academy. While talking to Officer Soderberg, Detective Visor observed Officer Soderberg remove his duty belt, which contained his firearm, and place it in Officer Soderberg's yellow Subaru. He also observed the officer begin unbuttoning his uniform shirt to change clothes before the game.

¶ 5    Detective Visor then left the parking lot to finish his last hour of his shift. He was driving nearby when he heard police sirens and a car race by him. He then followed the car to the station. He learned that someone had been shot in the south parking lot. Detective Visor observed Officer Soderberg's body against a fence between two cars.

¶ 6    Isaac Potts lived a few houses from the police station at 1139 West 61st Street. On the afternoon of July 7, 2010, he and a friend were fixing bicycles in front of his house. At around 3:30 or 3:40 p.m., he observed defendant walk by toward 61st Street and Racine Avenue. Potts heard defendant singing what sounded like a rap song, saying "shoot a mother***, kill a mother***." When asked by the prosecutor if defendant said, "f*** the police, shoot the police," Potts responded, "Yeah, I heard him say it ***." A few minutes later, Potts heard gunfire and dropped to the ground. He then got up, looked around, and headed toward the police station. He observed defendant holding something in his hand and walking toward a building across the street from the police station. Potts then observed defendant fire a gun approximately six to eight times.

¶ 7    Next, Potts observed defendant walk back toward the police station with a blue bag that defendant had not possessed previously. While defendant was in the street, a female police

officer came out of the station. Defendant walked toward her and fired two to three times. Potts observed defendant try to chase the officer as she was taking cover near a squad car. Two additional officers came outside and ordered defendant to drop the gun, which defendant did not do. An officer then shot him.

¶ 8        On July 7, 2010, Lucas Sanchez was a landscaper employed by Christy Webber landscaping company. He testified through a translator. He was supervising a crew at the police station. At approximately 3:40 p.m., Sanchez was trimming bushes running north to south on Racine Avenue between the street and the parking lot. He heard voices behind him and turned to see "a police officer and an African-American going at each other's hands." He was approximately "50 meters" away and had not seen either man enter the parking lot. He described the officer as being in a blue shirt as part of his police uniform and the other man was shirtless. Both men were punching each other near a car with an open trunk. Sanchez then looked for someone else in the parking lot to get help for the police officer. He observed a woman smoking in a car about 30 feet away. He went to talk to her in English as best he could. While he was talking to her, he heard two to three gunshots from the direction of the fight between the officer and the African-American. Sanchez saw the African-American with the gun in his hand and walking toward Racine Avenue. Sanchez identified defendant as the African-American with the gun.

¶ 9        Richard Mints, another witness, was working to rehab a building that day located at 6117 South Racine Avenue, across the street from the police station. At approximately 3:40 p.m., he was working on the front porch with a blue bag containing his tools. He noticed a man walking west on 61st Street toward Racine Avenue. The man was wearing jeans and had a white t-shirt over his shoulders. Mints testified that the man was "ranting raving" about the police and "talking crazy." According to Mints, the man said "f*** the police. I don't care about them. They can't do nothing to me and stuff ***." Mints observed the man stop at a door to the police station facing Racine Avenue and try to gain entry by grabbing the doorknob, but the door did not open. The man then walked around into the parking lot. Mints could not see inside the parking lot due to some bushes. Two to three minutes later, Mints heard two to three gunshots from the direction of the parking lot.

¶ 10        Mints then observed the man walking from the parking lot toward the building where Mints was working. The man asked Mints, "what the f*** I was looking at." The man then raised the gun and fired at Mints. The man began to walk up the steps to the porch of the building, so Mints ran to the courtyard of the building and up to the third floor into a vacant apartment. While he was running, Mints heard three to four more gunshots. While in the vacant apartment, Mints heard more gunshots and looked out the window. He observed the man chasing a police officer around a car. He heard the officer telling the man to drop his weapon. When Mints came downstairs, he noticed that his blue bag was gone. He also observed that the man was on the ground with several police officers outside. Mints saw his blue bag near the man. That night, Mints looked at a photo array, but was unable to make an identification because he was not looking at the man's face. The parties stipulated that when Mints met with a detective on July 7, 2010, Mints said the man was screaming and he was unable to understand him.

¶ 11        Officer Lynn Casey was assigned to building security as a desk officer on July 7, 2010. She was retired at the time of trial. At about 3:40 p.m., Officer Casey was at the desk when she heard what sounded like fireworks at the door of the station facing Racine Avenue. She went

out of the door to see what was happening and observed a man, identified as defendant, across the street, exiting a gangway. He had blood on his head and chest. She ran back inside to radio for assistance. She went back outside and observed defendant carrying a bag with his hands at his side. She called out to him, and he called something in response, but she could not understand what he said. Defendant then raised his right hand and fired a gun several times in her direction. Officer Casey took cover by a squad car and radioed for help. Defendant continued to fire in her direction and walked toward the squad car. Officer Casey ordered defendant to drop the gun. At some point defendant fell to the ground, and Officer Casey realized defendant had been shot by officers behind her at the station. She came out from behind the car and walked to defendant. She kicked the gun away from his hand.

¶ 12   Officer Kimberly Thort was assigned to the targeted response unit at the police station on July 7, 2010. At approximately 3:40 p.m., she was in her office on the second floor when she heard several gunshots. She went to the windows and observed defendant walking across Racine Avenue and shooting into a gangway. She ran downstairs to the first floor of the station. As she approached the bottom of the stairs, she heard a gunshot come through the east wall of the police station. Officer Thort "popped" into the gang unit and asked for help.

¶ 13   Officer Thort then exited the front door of the station and observed Officer Casey hiding behind a squad car. She noticed a black man on the sidewalk, identified as defendant, with a gun in his hand. She ordered him to drop the gun, but he did not drop the gun. Defendant raised the gun in her direction. Officer Thort fired three shots at him. Defendant began to walk toward her, and she fired three additional times, but none of the shots struck defendant. She went back into the building. Sergeant Jason Kaczynski then came outside and took her place in the doorway taking cover behind the door. She heard him order defendant to drop the gun and then observed Sergeant Kaczynski fire his weapon one time. They exited the building and placed defendant into custody.

¶ 14   On July 7, 2010, Sergeant Jason Kaczynski was scheduled to begin his shift at 4 p.m. At approximately 3:40 p.m., he was in the upstairs restroom when he heard gunfire. He exited the restroom and went downstairs. He observed Officer Thort in the doorway giving an order to someone outside. He heard gunfire. Sergeant Kaczynski went to the door to see what was going on and then told Officer Thort to step back because he "was going to challenge the offender." The offender, identified as defendant, was on the street by a police car. Defendant was bare chested and wearing pants. He told defendant to drop the gun, but defendant did not. Defendant pointed the gun at him, and Sergeant Kaczynski fired one shot. Defendant then dropped to the ground.

¶ 15   Detective Thomas Carr was at area one headquarters on July 7, 2010, at approximately 4 p.m. when he and his partner received an assignment that an officer had been shot. They arrived at the scene shortly thereafter. When he arrived, Detective Carr was not aware that Officer Soderberg had died. He observed an ambulance at the scene and was informed that the offender was inside. He entered the ambulance and saw defendant on a gurney and being treated by the paramedics. Defendant had been shot once in the chest. Detective Carr questioned defendant for less than five minutes.

¶ 16   After exiting the ambulance, Detective Carr spoke with officers at the scene and learned that Officer Soderberg's body was in the south parking lot. He and his partner proceeded to that location and observed the officer's body on the ground between two marked vehicles. Detective Carr then went to Officer Soderberg's vehicle, which was approximately one car

- 4 -

length south. He observed that the hatchback was open and inside was a duffle bag as well as other police and personal items. He later observed a Glock semiautomatic handgun in the grass in front of the police station. He subsequently learned that the Glock was registered to Officer Soderberg. The firearm could hold 17 rounds in the magazine with an additional round in the chamber. Approximately 16 cartridges were recovered by evidence technicians. Three cartridges were recovered in the area by Officer Soderberg's body. Detective Carr visited defendant in the hospital the following day and observed that defendant had a mark under his right eye.

¶ 17    Dr. Ponni Arunkumar testified that he was employed as the assistant chief medical examiner and gave testimony about Officer Soderberg's autopsy. Officer Soderberg sustained three gunshot wounds as well as bruises and abrasions to his arms, elbows, and right knee. The first gunshot wound was to the bridge of his nose, and the course of the wound was downward. The wound also indicated close-range firing of two feet or less. The second gunshot wound entered the top right of his head, coursing right to left and downward. The wound also indicated close-range firing. The third gunshot wound entered his right upper back, with a slightly upward movement. The first two gunshots were consistent with a person standing over the victim's head and firing at close range and either could have caused sudden death. The third wound was consistent with being shot while in a running motion and slightly down, and it would have been possible to move after receiving the gunshot to the back. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 18    After the State rested its case-in-chief, defendant moved for a directed finding, which the trial court denied.

¶ 19    Defendant testified on his own behalf. He initially testified that he was living with his mother at 42nd Street and Wolcott Avenue, but later admitted that his mother was living at 5814 South Wolcott Avenue. He admitted to using cocaine, heroin, PCP, marijuana, and "wicky sticks," which are cigarettes dipped in PCP. He spent the night of July 6, 2010, at his friend's house at 61st Street and Carpenter Avenue. The morning of July 7, 2010, he smoked marijuana and left on foot to go to his mother's house. He walked to 61st Street and Racine Avenue. He then turned south on Racine Avenue and walked through the parking lot. He was planning to climb over the fence as a shortcut. According to defendant, he did not try to open a door to the police station.

¶ 20    According to defendant, as he was climbing the fence, he was pulled from the fence by the back of his shirt and then struck with a gun on his head. The gun fell from the officer's hand and landed in front of a car. As the officer was reaching for the gun, defendant pushed him and grabbed the gun. Defendant then wrestled with the officer for the gun. The gun went off and struck the officer on the left side of the bridge of his nose. Defendant testified that the officer continued to reach for the gun and the gun fired a second time. The officer fell between police cars and defendant ran out of the parking lot.

¶ 21    Defendant testified that he tried to alert someone that the officer was shot by knocking on a door to the police station, but no one answered. He kept the gun and continued walking. He noticed Mints across the street and a bag on the porch. Defendant fired a couple times. He claimed he was not trying to shoot Mints, but fired a warning shot. Mints ran into the building. Defendant then took Mints's blue bag.

¶ 22    Defendant stated that Officer Casey started shooting at him from the door of the police station. She asked if he was okay and ordered him to put the gun down, then she shot at him a

couple times. Defendant returned fire and shot three times. He was in the middle of Racine Avenue at this time. He denied firing at any officers other than Officer Casey. He chased the officer by a police car as she was reloading. At some point defendant was shot in the chest. Officer Casey came over and kicked the gun from his hand. He was handcuffed and put in ambulance. He remained hospitalized for a week, and subsequently sent to jail.

¶ 23    During cross-examination, defendant admitted that he had been arrested for three bags of cocaine and had been processed at that police station. Defendant was mad at the police after he was arrested with a bag of marijuana. He denied telling correctional officers in August 2013 that he was going to "smoke you mother***" when he got out and he was a "cop killer." He denied shooting Officer Soderberg in the back. He also denied having his finger on the trigger, claiming that the officer must have pulled the trigger.

¶ 24    In rebuttal, the State presented the testimony of Vernon Brown. Brown lived in the same house as defendant's mother. Each rented a bedroom and shared common areas. Defendant stayed with his mother for over a year, left, and then returned. Brown heard defendant on multiple occasions say, "f*** the police. I'm going to kill those mother***." Brown was aware that defendant had been arrested at the police station at 61st Street and Racine Avenue. Brown testified that defendant became easily agitated and aggressive toward him, making him afraid of defendant.

¶ 25    Although additional testimony was presented by defendant and in the State's rebuttal regarding defendant's mental health and effects of his head injuries, we need not detail this testimony because it does not relate to the sole issue raised on appeal regarding whether Officer Soderberg was performing his official duties at the time of his murder.

¶ 26    Following the trial, the trial court found defendant guilty of the first degree murder of Officer Soderberg; attempted first degree murder of Officer Casey, Officer Thort, Sergeant Kaczynski, and Richard Mints; armed robbery of Mints; disarming a peace officer; and aggravated discharge of a firearm. The court subsequently sentenced defendant to natural life for first degree murder, 100-year terms for each attempted murder of the police officers, 50-year terms for the attempted murder and armed robbery of Mints, and 15 years for disarming a peace officer. The sentences for attempted murder and armed robbery were to run concurrently to each other, while the 15 years for disarming a peace officer was to run consecutively. All counts were to run consecutive to defendant's sentence of natural life. The total sentence was natural life plus 115 years.

¶ 27    This appeal followed.

¶ 28    On appeal, defendant argues that the State failed to prove beyond a reasonable doubt that Officer Soderberg was killed "during the course of performing his official duties," and therefore, his sentence of natural life must be vacated. The State responds that Officer Soderberg, while in uniform, was confronted and assaulted by defendant in the police station parking lot, and as a result of defendant's attack, Officer Soderberg shifted to performance of official duties.

¶ 29    The relevant indictment of first degree murder alleged that defendant "without lawful justification, intentionally or knowingly shot and killed [Officer Soderberg] with a firearm and during the commission of the offense he personally discharged a firearm that proximately caused death." The indictment further asserted that

"[t]he State shall seek an extended term sentence in that the murdered individual was a peace officer killed in the course of performing his official duties and the defendant knew or should have known that the murdered individual was a peace officer."

¶ 30    Defendant contends that the State failed to prove Officer Soderberg was killed "in the course of performing his official duties," as required to impose an extended-term sentence under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the United States Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Since the State was required to prove the aggravating factor, *i.e.*, Officer Soderberg was killed in the course of performing his official duties, beyond a reasonable doubt, the standard of review is the same as a challenge to the sufficiency of the evidence. *People v. Nevarez*, 2012 IL App (1st) 093414, ¶ 66. We consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

¶ 31    Here, the statutory sources for the aggravating factor in the indictment were section 9-1(b)(1) of the Criminal Code of 1961 and section 5-8-1(a)(1)(c)(iii) of the Unified Code of Corrections. See 720 ILCS 5/9-1(b)(1) (West 2010); 730 ILCS 5/5-8-1(a)(1), (c)(iii) (West 2014). Both statutes include the same language regarding the murder of a peace officer "killed in the course of performing his official duties." 720 ILCS 5/9-1(b)(1) (West 2010); 730 ILCS 5/5-8-1(a)(1), (c)(iii) (West 2014).

¶ 32    The Illinois Supreme Court has held that a peace officer "has the duty to maintain public order wherever he may be; his duties are not confined to a specific time and place." *Arrington v. City of Chicago*, 45 Ill. 2d 316, 318 (1970); see also *In re Joel L.*, 345 Ill. App. 3d 830, 834 (2004); *People v. Weaver*, 100 Ill. App. 3d 512, 514 (1981); *People v. Barrett*, 54 Ill. App. 3d 994, 996 (1977). As the *Barrett* court reasoned, "[i]t is the nature of the acts performed by the officer which determine whether the officer was in the execution of his official duties." *Barrett*, 54 Ill. App. 3d at 997.

¶ 33    In *Barrett*, a police officer was off duty and working as a paid security guard in a retail store while in his police uniform. A store employee notified the officer that defendant and his brother were attempting to steal items from the store. The officer then approached the men and informed them that they were being placed under arrest. During a struggle, the officer was struck by defendant two or three times. Defendant was subsequently convicted of aggravated battery and challenged whether the State proved an element of aggravated battery, whether the officer was engaged in the execution of his official duties. *Id.* at 994-95.

¶ 34    The reviewing court concluded the element had been proven that the officer was engaged in the execution of his official duties when placing the men under arrest for shoplifting. The court reasoned that the "decisive factor" at the time was "the nature of the acts he performed and not his employment status at the time." *Id.* at 996. The *Barrett* court found support in a federal case from the Sixth Circuit, *Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975), " '[t]he fact that a police officer is on or off duty, or in or out of uniform is not controlling. It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or

off duty, which determines whether the officer has acted under color of law.' " (Internal quotation marks omitted.) *Barrett*, 54 Ill. App. 3d at 996 (quoting *Stengel*, 522 F.2d at 441).

¶ 35    In *Weaver*, an officer driving his private vehicle toward the village where he served as a police officer observed the defendant driving erratically. The officer followed the defendant into town, went to his home, and changed to his squad car. He learned via radio communication where the defendant had been seen, drove to that location, and placed defendant under arrest. During the arrest, the defendant struck the officer. *Weaver*, 100 Ill. App. 3d at 513-14. The reviewing court held that "a police officer has the duty to maintain public order wherever he may be, as long as he is within the State." *Id.* at 514. The court concluded that when making an arrest, an officer is "always engaged in execution of his official duties." *Id.*

¶ 36    In *In re Joel L.*, respondent had been adjudicated delinquent and placed on probation. The State filed a petition to revoke probation, and a supplemental petition was filed later based on allegations of aggravated battery against a peace officer. The respondent attended a special education facility. The school hired police officers to provide security for the school. The officer involved in the case was not in uniform, but wore a polo shirt with Springfield Police Department logo and carried his badge, firearm, and handcuffs. The officer was asked to handle a disturbance involving the respondent. He escorted the respondent to the principal's office. While the principal was talking to the respondent, the respondent began making threats toward another student and yelling. The officer placed the respondent in handcuffs for everyone's safety, but did not tell respondent he was under arrest. The respondent was placed in a chair and the officer sat in another chair to begin paperwork. The respondent then kicked the table, which pushed a second table. The officer was seated at the intersection of the tables and his arm was pinched between the tables, causing a cut and a bruise. The trial court found that the respondent had committed aggravated battery and revoked his probation. *In re Joel L.*, 345 Ill. App. 3d at 831-32.

¶ 37    On appeal, the respondent argued, among other things, that the State failed to prove an element of aggravated battery in the course of performing his official duties because the alleged battery occurred while the officer was off duty and acting as a security guard. *Id.* at 833. The reviewing court rejected the respondent's argument, citing *Barrett* and *Weaver*. *Id.* at 834. The court held that "[w]hen viewed in the light most favorable to the prosecution, we must accept the trial court's conclusion that the testimony established that [the respondent] knew that [the officer] was a peace officer and that [the officer] was engaged in official duties for the purposes of the elements of the criminal statute." *Id.* at 835.

¶ 38    We also find the decision in *Banks v. City of Chicago*, 11 Ill. App. 3d 543 (1973), to be instructive. In this case, the plaintiff sued a police officer for wrongful death of her husband (the decedent), and received an award of $30,000. The plaintiff then sought indemnification from the City of Chicago, his employer. The facts established that the police officer was off duty and at an establishment that contained both a restaurant and a tavern, connected by a corridor. The officer had been drinking a beer in the tavern when he walked into the connecting corridor. He observed the decedent at the opposite end of the corridor, and the officer backed up against the wall to allow him to pass. As he passed, the decedent bumped the officer and told him to, " 'Get the f*** out of my way.' " *Id.* at 545. The officer took out his star and identified himself as a police officer, then continued to the restaurant as the decedent went the other direction. The officer was walking past a booth in the restaurant when the decedent ran

- 8 -

around him and pushed the barrel of a revolver into the officer's lip. The officer's mouth began to bleed, and he saw a flash, believing the decedent pulled the trigger. The decedent ran toward the south wall of the restaurant, and the officer ordered him the halt. The decedent turned, put both hands on the gun, and pointed it toward the officer. The officer pulled out his own gun and fired once at the decedent. The decedent slumped to the floor with the gun in his lap. He raised the gun a second time, aiming for the officer. The officer fired a second time and the decedent collapsed. *Id.* at 545-46.

¶ 39    The officer testified at trial that he was aware of a police rule that a police officer is considered to be on duty at all times and to respond immediately to any emergency. He was not sure if the incident in the restaurant constituted an emergency, but testified that he fired in self-defense. He also stated that his obligation as a police officer was to attempt to prevent the commission of a crime in his presence, and the decedent's actions constituted a crime. *Id.* at 546.

¶ 40    The trial court entered judgment in favor of the plaintiff and against the City of Chicago for the indemnification of the officer. On appeal, the city contended that the evidence did not prove the elements for recovery of indemnification, specifically whether the officer was engaged in the performance of his duties as a policeman. *Id.* at 547. The city asserted that the officer's off-duty shooting of the decedent "was an action motivated solely by a desire to save his own life, and was not within the performance of his duties as a police officer." *Id.* at 549. The reviewing court found this position "untenable." *Id.* The court reasoned:

> "The nature of a policeman's job is that he be fit and armed at all times, whether on or off duty, and subject to respond to any call to enforce the laws and preserve the peace. It is true that his being considered 'on duty' at all hours of the day or night does not result in all of his acts being deemed to have been taken in the performance of his duties as a police officer. *Karas v. Snell*, 11 Ill. 2d 233 [(1957)]. However, since he is always obligated to attempt to prevent the commission of crime in his presence, any action taken by him toward that end, even in his official off-duty hours, falls within the performance of his duties as a police officer." *Id.* at 549-50.

The reviewing court held that the officer was acting in performance of his duties and affirmed the award for indemnification, observing

> "The fact that [the officer] happened also to have shot in self-defense was purely coincidental to his attempt to prevent a crime in the performance of his duties as a police officer. To hold otherwise would require the incongruous finding that a police officer is invested with the authority and duty to defend all lives but his own. We cannot so find." *Id.* at 550.

¶ 41    We find the court's reasoning to be applicable to the facts of the present case. Here, defendant was observed walking toward the police station while ranting profanely about the police by Potts and Mints. Brown testified about defendant expressing violent thoughts toward the police with vulgar language on multiple occasions. Defendant was seen attempting to enter the police station, but was unable to enter. Officer Soderberg had been dropped off near his car in the south parking lot. He was in uniform and beginning to change his clothes. He had placed his duty belt in his car. At some point, defendant confronted Officer Soderberg. Sanchez, who was nearby trimming the bushes at the station, observed the men engaged in a fist fight with both men throwing punches. As Sanchez was trying to inform someone about the fight and to

help the officer, he heard gunshots. Defendant was observed leaving the parking lot with Officer Soderberg's firearm and proceeded to fire at Mints and multiple officers.

¶ 42 While we do not know the exact circumstances in which defendant first approached Officer Soderberg, the evidence is uncontested that defendant obtained the officer's firearm and shot the officer three times. Defendant contends that Officer Soderberg's actions were not in performance of his official duties, but as a victim of a crime. We reject that position. As in *Banks*, defendant's actions toward the officer were the commission of a crime, which Officer Soderberg had a duty to prevent. We agree with the *Banks* court's conclusion that a police officer has a duty to prevent commission of crime and to defend all lives, including his own. Thus, the trial court, as the factfinder, could find that any action taken by Officer Soderberg to prevent the commission of any crime, including a crime committed against himself, was in performance of his official duties. In reviewing the evidence in the light most favorable to the State, we accept the trial court's conclusion that the State sufficiently proved beyond a reasonable doubt that Officer Soderberg was killed while in the course of performing his official duties and affirm defendant's sentence of natural life. Since we have affirmed defendant's natural life sentence, we need not reach defendant's argument asking to vacate his sentences for attempted first degree murder of Officer Casey, Officer Thort, and Sergeant Kaczynski because this argument was contingent on this court vacating his natural life sentence, which have not done.

¶ 43 Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 44 Affirmed.

- 10 -