2022 IL App (1st) 191358-U

THIRD DIVISION
June 15, 2022

No. 1-19-1358

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 14226 |
| | ) | |
| BRYANT BREWER, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*:    Defendant forfeited his claim of ineffective assistance of trial counsel by failing to raise the issue on direct appeal. Even if not forfeited, the trial court properly dismissed defendant's *pro se* postconviction petition at the first stage because defendant failed to set forth an arguable claim of ineffective assistance of trial counsel.

¶ 2     Defendant Bryant Brewer appeals the trial court's first stage dismissal of his *pro se* postconviction petition, arguing his petition set forth the gist of a claim that his trial counsel was ineffective for failing to fully investigate and present additional evidence to support his insanity defense.

¶ 3      Following a bench trial, defendant was found guilty of the first degree murder of Chicago police officer Thor Soderberg; the attempt first degree murder of Officers Lynn Casey and Kimberly Thort, Sergeant Jason Kaczynski, and Richard Mints; disarming of a peace officer; and armed robbery while personally discharging a firearm. The trial court subsequently sentenced defendant to a mandatory term of natural life for the first degree murder and a total term of 115 years for the remaining convictions.

¶ 4      Prior to trial, defense counsel informed the court that defendant had "decompensated" and was not fit to stand trial. A behavioral clinical examination (BCX) was ordered, and defendant was examined for his fitness to stand trial. Following a hearing, the trial court found defendant fit to stand trial.

¶ 5      We outline the evidence presented at defendant's July 2015 bench trial as necessary for our disposition of this appeal. A full discussion of the evidence presented at defendant's trial was set forth in *People v. Brewer*, 2018 IL App (1st) 160155.

¶ 6      On July 7, 2010, Detective Phil Visor had been partnered with Officer Thor Soderberg for their shift assignment that day to Operation Project Youth, a program which helps children get to and from school safely. At approximately 3:40 p.m., Detective Visor dropped Officer Soderberg off at the south parking lot of the seventh district station, located at South Racine Avenue and West 61st Street. Officer Soderberg was planning on playing in a volleyball game at the police academy. While talking to Officer Soderberg, Detective Visor observed Officer Soderberg remove his duty belt, which contained his firearm, place it in his yellow Subaru, and begin to change his clothes before the game. Detective Visor then left the parking lot to finish his shift. While he was driving nearby, he heard police sirens and a car race by him, which he

2

followed to the station. He learned that someone had been shot in the south parking lot and later observed Officer Soderberg's body against a fence between two cars.

¶ 7      Isaac Potts lived a few houses from the police station at 1139 West 61st Street. On the afternoon of July 7, 2010, he and a friend were fixing bicycles in front of his house. At around 3:30 or 3:40 p.m., he observed defendant walk toward 61st Street and Racine Avenue. Potts heard defendant singing what sounded like a rap song, saying "shoot a mother***, kill a mother***." When asked by the prosecutor if defendant said, "f*** the police, shoot the police," Potts responded, "Yeah, I heard him say it ***." A few minutes later, Potts heard gunfire and dropped to the ground. He then got up, looked around, and headed toward the police station. Defendant was holding something in his hand and was walking toward a building across the street from the police station. Potts observed defendant fire a gun approximately six to eight times. Defendant then walked back toward the police station. While defendant was in the street, a female police officer came out of the station. Defendant walked toward her and fired two to three times. Defendant tried to chase the officer as she was taking cover near a squad car. Two additional officers came outside and ordered defendant to drop the gun. When defendant did not drop the gun, an officer shot him.

¶ 8      That day, Richard Mints, another witness, was rehabbing a building across the street from the police station. At approximately 3:40 p.m., he was working on the front porch with a blue bag containing his tools. He noticed a man walking west on 61st Street toward Racine Avenue. The man was wearing jeans and had a white t-shirt over his shoulders. Mints testified that the man was "ranting [and] raving" about the police and "talking crazy." According to Mints, the man said "f*** the police. I don't care about them. They can't do nothing to me and stuff ***." Mints observed the man stop at a door to the police station facing Racine Avenue and try to gain

3

entry by grabbing the doorknob, but the door did not open. The man then walked around into the parking lot, which was out of Mints' sight. Two to three minutes later, Mints heard two to three gunshots from the direction of the parking lot.

¶ 9      Mints then saw the man walking from the parking lot toward the building where Mints was working. The man asked Mints, "what the f*** I was looking at." The man then raised a gun and fired at Mints. The man began to walk up the steps to the porch of the building, so Mints ran to the courtyard of the building and up to the third floor into a vacant apartment. While he was running, Mints heard three to four more gunshots. While in the vacant apartment, Mints heard more gunshots and looked out the window. He observed the man chasing a police officer around a car. He heard the officer telling the man to drop his weapon. When Mints came downstairs, he noticed that his blue bag was gone. He also observed that the man was on the ground with several police officers outside. Mints saw his blue bag near the man.

¶ 10     At about 3:40 p.m. on July 7, 2010, Officer Lynn Casey was at the building security desk when she heard what sounded like fireworks at the door of the station facing Racine Avenue. She went out of the door to see what was happening and observed a man, identified as defendant, across the street, exiting a gangway. He had blood on his head and chest. She ran back inside to radio for assistance. When she went back outside, defendant was carrying a bag with his hands at his side. She called out to him, and he said something in response, but she could not understand what he was saying. Defendant then raised his right hand and fired a gun several times in her direction. Officer Casey took cover by a squad car and radioed for help. Defendant continued to fire in her direction and walked toward the squad car. Officer Casey ordered defendant to drop the gun. At some point defendant fell to the ground and Officer Casey realized defendant had

been shot by officers behind her at the station. She came out from behind the car and walked toward defendant. She kicked the gun away from his hand.

¶ 11     At approximately 3:40 p.m. on July 7, 2010, Officer Kimberly Thort was in her office on the second floor of the police station when she heard several gunshots. She went to the windows and observed defendant walking across Racine Avenue and shooting into a gangway. She ran downstairs to the first floor of the station. As she approached the bottom of the stairs, she heard a gunshot come through the east wall of the police station. Officer Thort then exited the front door of the station and observed Officer Casey hiding behind a squad car. She noticed a man on the sidewalk, identified as defendant, with a gun in his hand. She ordered him to drop the gun, but he did not drop the gun. Defendant raised the gun in her direction. Officer Thort fired three shots at him. Defendant began to walk toward her, and she fired three additional times, but none of the shots struck defendant. She went back into the building.

¶ 12     Sergeant Jason Kaczynski was in the upstairs restroom before the start of his shift when he heard gunfire. He exited the restroom, went downstairs, and observed Officer Thort in the doorway giving an order to someone outside. He heard gunfire and went to the door to see what was going on. Sergeant Kaczynski then told Officer Thort to step back because he "was going to challenge the offender." Defendant was on the street by a police car when Sergeant Kaczynski told defendant to drop the gun, but defendant did not do so. Defendant pointed the gun at him, and Sergeant Kaczynski fired one shot. Defendant then dropped to the ground.

¶ 13     Defendant testified on his own behalf. He admitted to having previously used cocaine, heroin, PCP, marijuana, and "wicky sticks," which are cigarettes dipped in PCP. On the morning of July 7, 2010, he smoked marijuana and left on foot to go to his mother's house. He walked to 61st Street and Racine Avenue. He was planning to climb over the fence in the police station

parking lot as a shortcut. Defendant contended that he did not try to open a door to the police station.

¶ 14    Defendant testified that as he was climbing the fence, he was pulled from the fence by the back of his shirt and then struck with a gun on his head. The gun fell from the officer's hand and landed in front of a car. As the officer was reaching for the gun, defendant pushed him and grabbed the gun. Defendant then wrestled with the officer for the gun. The gun went off and struck the officer on the left side of the bridge of his nose. Defendant testified that the officer continued to reach for the gun and the gun fired a second time. The officer fell between police cars and defendant ran out of the parking lot.

¶ 15    Defendant testified that he tried to alert someone that the officer was shot by knocking on a door to the police station, but no one answered. He kept the gun and continued walking. He noticed Mints across the street and a bag on the porch. Defendant fired a couple times. He claimed he was not trying to shoot Mints but fired a warning shot. Mints ran into the building. Defendant then took Mints' blue bag.

¶ 16    Defendant stated that Officer Casey started shooting at him from the door of the police station. She asked if he was okay and ordered him to put the gun down, then she shot at him a couple times. Defendant returned fire and shot three times. He denied firing at any officers other than Officer Casey. He chased the officer by a police car as she was reloading. At some point defendant was shot in the chest. Officer Casey came over and kicked the gun from his hand.

¶ 17    During cross-examination, defendant admitted that he had previously been arrested for possessing three bags of cocaine and had been processed at that police station. Defendant was mad at the police after he was arrested for a bag of marijuana. He denied telling correctional officers in August 2013 that he was going to "smoke you mother***" when he got out and he

6

was a "cop killer." He denied shooting Officer Soderberg in the back. He also denied having his finger on the trigger, claiming that the officer must have pulled the trigger.

¶ 18    Dr. Joan Leska, a clinical psychologist, testified in the defendant's case that she was hired to examine defendant on several issues. She met with defendant for about 20 hours over eight separate occasions from January 2012 to July or August 2014. She discussed her familiarity with psychotic disorders, which she defined as "major mental illness[es] that involve[] a distortion of reality." These disorders usually include delusions, hallucinations, thought disorder, bizarre behavior, and disorganized behavior. There are several different types of psychotic spectrum disorders with different symptoms. Both schizophrenia and schizoaffective disorder fall on the spectrum.

¶ 19    Dr. Leska reviewed defendant's records while he was incarcerated at Cermak Health Services (Cermak). She noted defendant had been seen by three or four psychiatrists while incarcerated and the records indicated that defendant was "typically" diagnosed with schizophrenia, disorganized type or psychotic disorder, not otherwise specified (NOS). Dr. Leska evaluated defendant for his fitness to stand trial twice. In January 2012, she found defendant was fit to stand trial, but following an evaluation in January 2014, she found defendant had deteriorated and was not fit for trial. During a subsequent evaluation, defendant was "very paranoid" with her and told her that he thought she was working for the State and was being too serious. She did not conduct a sanity evaluation to determine defendant's mental status at the time of the offenses because defendant became angry with her during the fitness hearing and made threats towards her. She then recused herself from further examinations of defendant.

¶ 20    In her experience with defendant and in general, someone could be "fairly lucid" and then either feel threatened or have some disturbing internal experience that causes them to

7

decompensate within minutes. Decompensation is when an individual deteriorates from his current level of functioning. Defendant would decompensate when feeling threatened "in terms of his esteem," such as his psychiatric status or intelligence, then he would become agitated. She did not find any evidence of malingering from defendant during the evaluations. Defendant denied having any hallucinations, delusions, or a major mental illness, but admitted that he becomes depressed. Based on her evaluations, she opined that defendant suffered from a psychotic spectrum disorder. She did not have an opinion as to defendant's sanity at the time of the offense because she did not conduct such an evaluation. Dr. Leska confirmed that defendant's toxicology results from July 7, 2010, indicated positive results for cannabis and PCP. She noted that PCP could have affected defendant's functioning that day.

¶ 21    During Dr. Leska's direct examination, the trial court asked defense counsel if he anticipated that Dr. Leska would offer her opinion regarding defendant's state of mind on July 7, 2010, the date of the offenses. Counsel responded that he did not but expected Dr. Leska to offer an opinion on what defendant's psychological or psychiatric diagnosis was during a mental health evaluation.

¶ 22    Dr. Leska discussed defendant's records from Cermak during cross-examination. Defendant's initial schizophrenia diagnosis and prescription of antipsychotic medication were reported by Dr. Kelner from Cermak in December 2010. In a January 2013 report, Dr. Steve Paschos from Cermak also diagnosed defendant with schizophrenia. Later in April 2013, Dr. Paschos observed in a report that defendant was showing "manipulative behavior." Dr. Leska agreed the records indicated that defendant used manipulative behavior to change divisions within the jail. She admitted that manipulation is one of the features of antisocial personality disorder, but also agreed that people with psychotic disorders engage in manipulative behaviors.

8

She also admitted that in a note from September 2013, Dr. Kelner observed that defendant was not expressing psychotic content and was intact cognitively. Dr. Leska did not consider defendant's manipulative behavior to be important. She was aware that defendant told another doctor that he was "messing" with her and was intentionally trying to deceive her. She found that behavior did not make sense because she was a psychological expert hired by defendant's lawyers.

¶ 23    Dr. James Corcoran, a forensic psychiatrist, was also called in defendant's case. He interviewed defendant four times at the request of defendant's counsel with the first interview occurring in July 2010. Dr. Corcoran was asked to evaluate defendant's sanity at the time of the events. He reviewed police reports, grand jury statements, as well as defendant's records from Cermak. At the first interview, defendant appeared "very superficially appropriate," but was easily distracted and inattentive. Dr. Corcoran stated that defendant often mispronounced words or would speak in "gibberish" such that he could not understand defendant for about 30 percent of the conversation. Defendant appeared to have mild confusion over the crimes.

¶ 24    Defendant told Dr. Corcoran that a struggle had ensued with Officer Soderberg and that defendant had been struck on the left side of his head. According to Dr. Corcoran, the left side of the brain controlled speech and language function and an injury in that area of the brain can cause aphasia, with symptoms of the inappropriate use or misuse of words as well as disorientation and disorganized thinking. Aphasia "refers to the inappropriate or misuse of words in common language, and it can be either expressive or receptive." Dr. Corcoran further explained that in terms of aphasia, receptive meant that one may hear something different than what was actually being spoken to them. Aphasia can be a symptom of a brain injury.

¶ 25    Defendant displayed disorientation or disorganized thinking during their July 2010

9

interview. In his opinion, defendant was suffering from aphasia. Dr. Corcoran also opined that defendant suffered a moderate head injury. However, he was unable to form an opinion as to whether defendant was sane at the time of the offenses. He did not know with absolute certainty whether defendant suffered from schizophrenia. Dr. Corcoran conceded that defendant's medical records did not demonstrate any evidence of brain damage, but he observed that an MRI was not conducted on defendant and the CT scan that was conducted did not show the use of an infusion to evidence disruption of blood vessels.

¶ 26     In rebuttal, the State presented two witnesses regarding defendant's sanity at the time of the offense, Dr. Christofer Cooper and Dr. Mathew Markos. Dr. Cooper, a forensic psychologist at Forensic Clinical Services, conducted a sanity evaluation of defendant in February 2015. Prior to the interview with defendant, Dr. Cooper reviewed many documents, including defendant's police records, medical records, as well as reports from Drs. Leska, Corcoran, and Markos.

¶ 27     Dr. Cooper had previously examined defendant on three separate occasions. Defendant acknowledged and recalled the three prior examinations, was fully compliant, and "appropriately responsive" to all questions. Dr. Cooper noted no clinical indication of acute psychological symptoms, significant cognitive dysfunction, or language difficulties. He testified that the CT scan performed on July 8, 2010, did not indicate any acute brain injury, such as hemorrhaging or structural damage, nor were there any behavioral or psychological indications of acute head trauma.

¶ 28     Defendant was not prescribed any psychotropic medication when he was transferred from Christ Hospital to Cook County Jail on July 15, 2010. The first mental health note while at the county jail was dated November 10, 2010, when defendant was referred for an assessment. At that time defendant denied any psychological symptoms. Additionally, a referral for a mental

health assessment is very low, especially in a case of this magnitude so Dr. Cooper found it significant that defendant had been in the jail for four months before any referral for a mental health assessment was made.

¶ 29     When Dr. Cooper performs a sanity examination, he reviews all available records and then he conducts a direct clinical interview in which he asks the individual "potentially dozens or hundreds of questions regarding the alleged offense." He specifically asks the individual to provide his or her own account of what happened. During defendant's examination, defendant told him that the offense occurred in July 2010 at the police station on Racine Avenue. He woke up at a friend's house and while walking home, he took a shortcut and then the police officer pulled him off of the fence near the police station without asking defendant what he was doing. The officer then began hitting defendant with a gun. Defendant did not fight back because the officer had the gun. When the gun dropped, they both reached for it and the gun fired. Dr. Cooper asked defendant if he had fired the weapon and defendant responded that the officer "made it shoot" with defendant's finger on the trigger. Defendant then said he got scared and shot the officer two additional times.

¶ 30     Afterwards, defendant walked away with the gun. He took a bag that a man had left in a yard because he had to place the gun somewhere. He said a female police officer fired at him multiple times so he fired three shots at her. Then another officer shot him in the chest, he fell to the ground and was placed into custody. Dr. Cooper testified that defendant offered consistent responses to several follow up questions.

¶ 31     Dr. Cooper found defendant's responses to his questions to be "very goal-directed," and "contextually appropriate." He had no difficulty communicating with defendant. He also asked defendant questions about whether defendant understood the criminality of his actions. Dr.

11

Cooper asked defendant if it was against the law to shoot and kill a police officer, and defendant responded in the affirmative. During the interview, defendant provided a fairly detailed, sequential account of the offense that was devoid of psychological symptoms. Defendant did not describe any bizarre or delusional ideation. Dr. Cooper asked defendant if it had been a normal day prior to the offense, and defendant answered yes and that he had smoked marijuana in the morning. Defendant was not receiving any mental health treatment or prescribed any psychotropic medication at the time of the offense.

¶ 32    At the time of the interview, defendant denied hearing any voices or visual hallucinations, or any suicidal or homicidal ideation. Defendant did not appear distracted or to be responding to any internal stimuli. Based on his interview, Dr. Cooper diagnosed defendant with antisocial personality disorder, which is a character disorder marked by a persistent pattern of the disregard or disrespect of the rights of others. Some of its hallmark features are aggressive behavior, antisocial or illegal conduct, impulsivity, irresponsibility, failure to obtain or maintain legal employment, lack of remorse, deceitfulness, and manipulation. In Dr. Cooper's opinion, within a reasonable degree of psychological certainty, defendant was legally sane at the time of the alleged offense.

¶ 33    Dr. Cooper further opined that defendant was not suffering from any mental disease or defect. He found no indication of aphasia in defendant's records. He recounted that defendant had no difficulty communicating during his four examinations. Dr. Cooper observed that at the time of his examination in February 2015, defendant was not on any antipsychotic medication which had been discontinued in late 2012. According to him, if a person with a psychotic mental disorder has discontinued the use of medication over a significant period, then one would expect to see a reoccurrence of those psychotic symptoms, which did not happen with defendant.

¶ 34    Dr. Cooper reviewed Dr. Leska's report related to her fitness examination prior to his own fitness evaluation. Because he observed "starkly" different presentations by defendant than in Dr. Leska's evaluation, he asked defendant if he spoke the same way to her as he had in that interview. Defendant told Dr. Cooper that he was "playing with her," referring to Dr. Leska. Defendant said he was "just joking" with her and he would say something wrong. He said she did not understand and "took it like offensive."

¶ 35    Although Dr. Cooper noted that defendant's records from Cermak indicated a schizophrenia diagnosis throughout, he saw no clinical descriptions in the records describing symptoms or behaviors consistent with schizophrenia. He admitted defendant's Cermak records did not include a diagnosis of antisocial personality disorder. At the same time, however, he pointed out that defendant's jail records contain many notations of aggressive, hostile, and manipulative behaviors, including nine incidents just between 2012 and 2013 demonstrating highly antisocial, aggressive, and antiauthority conduct, including a threat to harm or kill correctional officers. The records also contained evidence of defendant's manipulative behavior for a secondary gain, specifically defendant was seeking different housing within the jail.

¶ 36    Dr. Cooper agreed that schizophrenia typically manifests itself between late adolescence and early adulthood, and that defendant, who was the age of 24 at the time of the offense, fell within the timeline. Dr. Cooper conceded that even though defendant had no prior psychiatric hospitalizations, this fact did not rule out the possibility that he developed schizophrenia in his early 20s. Defense counsel also questioned Dr. Cooper about his diagnosis of antisocial personality disorder using the DSM-5 to discuss specific characteristics and whether there was any evidence of those in defendant's background, such as destruction of property, being deceitful or committing theft, and aggression towards people and animals.

¶ 37    Dr. Markos, a forensic psychiatrist, examined defendant to determine if he was sane at the time of the offenses. He previously evaluated defendant to determine his fitness to stand trial. He explained that the standard in Illinois for finding a person legally insane requires the individual to suffer from a mental disorder or defect which would cause that person to substantially lack the appreciation of the criminality of the act. His examination of defendant consisted of two parts, the first was a review of defendant's extensive records and the second was a clinical forensic psychiatric interview. Dr. Markos reviewed police reports, medical and psychiatric records, including reports from Drs. Cooper, Leska, and Corcoran, and histories from family members. He interviewed defendant for approximately an hour in March 2015.

¶ 38    Dr. Markos testified, to within a reasonable degree of medical and psychiatric certainty, that at the time of the offense, defendant was not suffering from a mental disease or defect that would cause him to lack the ability to appreciate the criminality of his actions. His opinion that defendant was legally sane was based upon the following. At or about the time of the offense, defendant did not suffer from any mental illness or defect which was directly or causally linked to the commission of the offense. Defendant did not manifest any psychotic symptoms, such as thought disorder, delusions, or hallucinations. Defendant recounted his actions that day which were substantially similar to the description defendant recounted to Dr. Cooper. When asked why he shot Officer Soderberg three times, defendant told Dr. Markos that he was "pissed off with the officer." Dr. Markos asked defendant if he knew it was a crime to shoot a police officer, and defendant responded that he knew this and thought the officer was "going to do [him] in." Dr. Markos found those two responses to be especially significant because it indicated that defendant had no remorse.

¶ 39   Dr. Markos diagnosed defendant with antisocial personality disorder, which is not a mental disease for purposes of the insanity defense, as well as a history of multiple substance abuse. He explained that an antisocial personality disorder is a progression of a conduct disorder that starts younger than 18, as shown by breaking the law, being deceitful, being aggressive, and breaking rules. The doctor also observed a history of this conduct disorder in defendant's past, including his failure to attend school, being expelled in the ninth grade, joining a gang at age 12, and selling drugs at age 14 or 15.

¶ 40   Defendant's records from Cermak initially documented that he was schizophrenic and had schizophrenic symptoms. However, over a period of four or five years, the records reflected defendant's antisocial behavior, such as manipulative, aggressive, and oppositional traits. Dr. Markos did not believe defendant had schizophrenia because defendant did not demonstrate any of the essential symptoms of schizophrenia.

¶ 41   Dr. Markos considered and discussed defendant's Cermak records to show defendant's progression while incarcerated. He explained that part of his review of the Cermak records was to substantiate his diagnosis of antisocial personality disorder. There was "ample foundation" for the doctor's diagnosis and the records were "replete" with antisocial behavior in a structured setting

¶ 42   Dr. Markos also pointed to a report from November 2010 by Dr. Hallberg which noted defendant was alert, oriented, pleasant, and cooperative, with no auditory or visual hallucinations. Although defendant's prescription for Risperidone was continued, and Risperidone is a commonly prescribed psychotropic medication to alleviate symptoms of psychosis, it is also used to treat agitation, aggression, and management problems. And while a December 2010 record indicated Dr. Kelner diagnosed defendant with schizophrenia, Dr.

Markos observed that he saw no objective or subjective evidence of schizophrenic illness in defendant. He noted that defendant's medical records would reflect all past diagnoses, which meant the schizophrenia diagnosis would have continued to appear in defendant's records. A report by Dr. Moreno in March 2012, was important to Dr. Markos because Dr. Moreno indicated that defendant's last episode of auditory or visual hallucinations was while in the outside world, which indicated no evidence of hallucinations while in jail. Dr. Moreno noted a history of schizophrenia, referring to Dr. Kelner's previous diagnosis.

¶ 43    In June 2012, Dr. Mansour diagnosed defendant with schizoaffective disorder, which is mutually exclusive to schizophrenia and contradictory to Dr. Kelner's diagnosis of schizophrenia. According to Dr. Markos, the diagnostic criteria for schizophrenia required that schizoaffective disorder be ruled out. In a July 2012 record, Dr. Bonilla noted defendant's drug-seeking behavior, demanding medication due to perceived euphoriant properties and potential for diversion and abuse. Dr. Markos noted that this was self-serving behavior, and not the behavior of a schizophrenic because most schizophrenics minimize their symptoms. Dr. Bonilla's report indicated a need to look for malingering or exaggeration of symptoms in defendant. In an October 2012 record, Dr. Kelner also observed defendant requested specific medications, Wellbutrin and Klonopin.

¶ 44    In November 2012, Dr. Moreno reported that defendant had been transferred to Stroger Hospital because of a suspected overdose, but upon his return, defendant informed personnel that he was not trying to commit suicide but trying to get high on "hooch" and had been asking for Effexor, a psychotropic, antidepressant medication. Here again, defendant denied any paranoia, auditory, or visual hallucinations. A report by Dr. Paschos from January 2013 recorded a fight between defendant and a corrections officer, which was not the result of any mental illness. Dr.

Markos found defendant's actions to be reflective of antisocial behavior. Dr. Markos discussed additional reports from January 2013 in which defendant was engaging in drug seeking behavior. Another report from early 2013 indicated that defendant assaulted another inmate because the inmate called defendant a "b****" which was again consistent with aggressive behavior. In a February 2013 report, Dr. Adame indicated that defendant had been screaming and banging on his cell doors and saying that he was hearing voices, but defendant gave contradictory answers when questioned about this incident. Dr. Adame concluded that defendant was attempting to feign symptoms to seek more favorable housing in the jail.

¶ 45    In an April 2013 report, Dr. Ibarra noted that defendant had flipped food trays and moaned and sobbed and spoke in gibberish, but Dr. Ibarra reported that defendant answered all questions in an appropriate tone and manner and defendant did not appear disorganized in his thought. In Dr. Markos's opinion, defendant's behavior was not due to a thought disorder or schizophrenia. The next day, defendant explained to Dr. Paschos about the same incident that he was sick of being in jail for three years and that he loved himself, which indicated defendant knew what he was doing and would not hurt himself. Also in April 2013, Dr. Paschos described defendant's manipulative behavior for secondary gain, but the doctor maintained the diagnosis of schizophrenia. Dr. Markos found this to be a contradiction. Dr. Markos explained that in these records, physicians were describing "either malingering or manipulative, self-serving behavior, aggressive behavior," but the continued diagnosis of schizophrenia was not consistent with this behavior and was consistent with an antisocial personality disorder. Dr. Paschos's report discussed defendant manipulating symptoms for secondary gain of housing, which is goal-directed and self-serving and not the result of a mental illness. Dr. Paschos further noted that defendant was highly manipulative in interview settings with the mental health staff.

¶ 46    A November 2013 report by Dr. Stasi described defendant as stable and he denied any psychiatric symptoms. Dr. Markos observed that defendant had not been taking any antipsychotic medication for more than a year and was stable. According to Dr. Markos, if defendant was "truly a schizophrenic he should be on anti-psychotic medication, and if he has not been on anti-psychotic medication for a full year and is not psychotic, he is not schizophrenic." However, during that same time, defendant manifested aggressive, manipulative, and assaultive behavior consistent with antisocial personality disorder. Dr. Markos conceded that antisocial personality disorder is not mentioned in defendant's records from Cermak. Defense counsel also cross-examined Dr. Markos about antisocial personality disorder under the DSM-5.

¶ 47    Dr. Markos explained that he did not consult with defendant's treating physicians because there was a conflict of interest regarding his forensic evaluation and opinion compared to treating a patient. He did not dispute their findings but did not find it necessary to corroborate their conclusions by speaking with them.

¶ 48    Dr. Markos further opined that based on his evaluation of defendant and his records, defendant did not suffer from aphasia. Defendant spoke "coherently and relevantly" during the interviews and was able to communicate with Dr. Markos. Dr. Markos saw no clinical evidence of aphasia in defendant. He also did not see evidence of aphasia in defendant's records. He conceded that a person with a brain injury could potentially engage in manipulative behavior.

¶ 49    Kristy Gaichas, paramedic for the City of Chicago Fire Department, received an assignment of a person shot near West 61st Street and South Racine Avenue at approximately 3:50 p.m. on July 7, 2010. At the scene, she observed defendant had been shot in the chest and then began to treat him at the scene and transported him to Christ Hospital. While transporting defendant, Gaichas spoke with him. She asked him questions about his medical history, his age,

his address, and things of that nature. Defendant was able to answer her questions and she described defendant as "completely lucid answering." When defendant was being transferred to the hospital, defendant started swearing at Gaichas and her partner. In her line of work, Gaichas had seen patients suffering from aphasia and defendant did not have aphasia because defendant was lucid in answering questions.

¶ 50    Joseph DeRoche, a corrections officer for Cook County, was doing cell inspections at the Cook County Jail on August 10, 2013, and defendant told the officer and his partner that he was going to "smoke you mother***,  when I get out." Defendant then said, "I am a cop killer, mother***, and you are next." Defendant repeated this several times. Officer DeRoche wrote defendant up for a disciplinary report.

¶ 51    Vernon Brown lived in the same house as defendant's mother. Each rented a bedroom and shared common areas. Defendant stayed with his mother for over a year, left, and then returned. On multiple occasions, Brown heard defendant say, "f*** the police. I'm going to kill those mother***." Brown was aware that defendant had been arrested at the police station at 61st Street and Racine Avenue. Brown testified defendant became easily agitated and aggressive toward him which made Brown afraid of defendant.

¶ 52    Following closing arguments, the trial court found defendant guilty of the first degree murder of Officer Soderberg; attempted first degree murder of Officer Casey, Officer Thort, Sergeant Kaczynski, and Richard Mints; armed robbery of Mints; disarming a peace officer; and aggravated discharge of a firearm. In reaching its finding, the trial court rejected defendant's insanity defense. The court observed that the record was "very, very clear" that no one presented evidence that established "in a proper manner that [defendant] ever suffered from schizophrenia

or schizoaffective disorder." Regarding the testimony about the Cermak medical records, the court reasoned as follows.

> "There was testimony *** from the expert witnesses *** that a certain doctor or doctors at Cook County Jail, Cermak Hospital, had apparently diagnosed Mr. Brewer as having suffered from schizophrenia. That testimony is not admissible to establish at all that Mr. Brewer suffered or suffers from the mental disease of schizophrenia or schizoaffective disorder. That testimony is only admissible, as I indicated before, pursuant to Wilson versus Clark, People versus Anderson, People versus Nieves, to show the basis of the testifying experts' opinion. It is not admissible to establish by that hearsay testimony that Mr. Brewer suffered or suffers from schizophrenia. I mention this point because there is simply no evidence notwithstanding the number of times in which schizophrenia got mentioned. There was simply no evidence which I could even conclude I might believe that establishes that he was suffering from the mental disease of schizophrenia, none."

¶ 53    The trial court discussed Dr. Leska's opinion that defendant suffered from "some psychotic spectrum disorder that could include schizophrenia or schizoaffective disorder," but the court found this opinion "difficult to credit on the face of the fact that for one thing schizophrenia and schizoaffective disorder are very different from each other." The court also found that Dr. Corcoran's diagnosis of aphasia was not supported by the evidence and was refuted by the treating doctors at Christ Hospital. The court observed that defendant was required to establish by clear and convincing evidence that he lacked the capacity to appreciate the criminality of his conduct when he committed the offenses. The court concluded that defendant's

decision to stop taking antipsychotic medication and afterwards he did not "with any regularity exhibit any psychotic symptoms while in Cook County Jail to any appreciable extent that would permit a reasonable, creditable psychologist or psychiatrist to conclude that he was suffering some mental illness."

¶ 54    On direct appeal, defendant argued that the State failed to prove that Officer Soderberg was killed during the course of performing his official duties. This court concluded that "any action taken by Officer Soderberg to prevent the commission of any crime, including a crime committed against himself, was in performance of his official duties" and held that the State sufficiently proved defendant guilty beyond a reasonable doubt. *Brewer*, 2018 IL App (1st) 160155, ¶ 42.

¶ 55    In February 2019, defendant filed his *pro se* postconviction petition alleging multiple claims of ineffective assistance of trial counsel, including a claim that trial counsel failed to investigate defendant's insanity defense. He also asserted that his appellate counsel was ineffective for failing to raise these issues on direct appeal. Specifically, defendant argued that trial counsel "blindsided the Court, the State and [himself] with the presentation of an insanity defense." Defendant claimed that "there was no investigation or proper preparation of this defense by counsel prior to trial." He further asserted that his insanity defense required "a complete investigation" of his mental state, but instead trial counsel relied on Dr. Corcoran rather than his treating physicians at Cermak, who were not interviewed or called to testify at trial. According to defendant, this deficient performance by counsel prejudiced him and rendered the outcome of the trial unreliable.

¶ 56    In May 2019, the trial court entered a written decision dismissing defendant's petition as frivolous and patently without merit. In its decision, the court held that defendant's claims were

21

forfeited because they were a matter of trial record and could have been raised on direct appeal. Even if the claims had not been forfeited, the court found "the record indisputably rebuts" defendant's claim that his trial counsel failed to properly investigate his insanity defense. The court observed that defendant's treating physicians at Cermak often found evidence contrary to defendant's claims of mental illness. The court further noted that defendant's mental health was the subject of both a fitness hearing and a hearing regarding his ability to understand his *Miranda* warnings immediately following the commission of the offenses. The court rejected defendant's claim that counsel did not prepare for an insanity defense.

> "[T]he evidence is clear that defense counsel not only thoroughly investigated petitioner's mental health, but also ardently advocated for petitioner to be able to raise an insanity defense at trial. Counsel's investigation began three years before petitioner's trial and continued through numerous hearings and proceedings in front of the court. The fact that defense counsel chose not to call witnesses at trial who may have harmed his defense of mental insanity does not indicate a lack of investigation. Rather, it denotes solid trial strategy. There were repeated doctors' comments in petitioner's medical history, over a period of several years, which seemed to indicate petitioner was malingering or being manipulative, rather than mentally ill. Calling the doctors that made these findings of malingering or manipulative behavior as witnesses would not have helped support petitioner's insanity defense."

¶ 57    This appeal followed.

¶ 58    The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-8 (West 2018)) provides a tool by which those under criminal sentence in this state

can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2018); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 59    At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Hodges*, 234 Ill. 2d at 16-17. Pursuant to section 122-2, the defendant must attach to his petition "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012). "This low threshold does not excuse the *pro se* petitioner from providing factual support for his claims; he must supply sufficient factual basis to show the allegations in the petition are 'capable of objective or independent corroboration.' "

*People v. Allen*, 2015 IL 113135, ¶ 24 (quoting *People v. Collins*, 202 Ill.2d 59, 67 (2002)). "A postconviction petition that is not supported by affidavits or other supporting documents is generally dismissed without an evidentiary hearing unless the petitioner's allegations stand uncontradicted and are clearly supported by the record." *People v. Waldrop*, 353 Ill. App. 3d 244, 249 (2004).

¶ 60    At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. *Coleman*, 183 Ill. 2d at 380. At this stage, the circuit court is not permitted to engage in any fact-finding or credibility determinations, as all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. *Coleman*, 183 Ill. 2d at 385.

¶ 61    On appeal, defendant argues that the trial court erred in dismissing his postconviction petition because he presented the gist of a meritorious claim of ineffective assistance of counsel for failing to fully investigate his sanity at the time of the offense and present witness testimony from his treating physicians at Cermak. Defendant has not challenged the other claims presented in his petition on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal).

¶ 62    The State first responds that defendant forfeited the ineffective assistance claim by failing to raise it on direct appeal because it is based entirely on matters contained in the trial record. Claims that could have been raised on direct appeal but were not, are forfeited in postconviction proceedings. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). The doctrine of forfeiture may be relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective

assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 63    Defendant attempts to avoid forfeiture by contending that defendant's claim raised factual allegations outside the record. Defendant, however, refers only to his own allegations that trial counsel failed to fully investigate his insanity defense and failed to interview his treating physicians at Cermak. Defendant did not attach additional documentation to his petition apart from his own affidavit setting forth standard language that the petition accurately reflected the facts and circumstances to the best of his knowledge and recollection and he made the declarations in good faith. Additionally, defendant did not attach any of his medical records from Cermak supporting his claim that the diagnoses from his treating physicians could have supported his insanity defense. Defendant's bare allegations without any evidentiary support capable of independent corroboration fail to satisfy the low threshold of first stage review. See *Allen*, 2015 IL 113135, ¶ 24.

¶ 64    Absent any additional supporting documentation, defendant's argument is derived from the trial record. In his petition, defendant cites to the trial record to support his claim that he had been diagnosed with schizophrenia and schizoaffective disorder prior to trial. Since defendant's claim of ineffective assistance of trial counsel is a matter of trial record, he could have raised it on direct appeal but failed to do so. Accordingly, this claim has been forfeited.

¶ 65    Further, although defendant argued in his petition that his appellate counsel was ineffective for failing to raise this claim on direct appeal, he did not raise this claim in his opening appellate brief. Defendant points out in his reply brief for the first time that his postconviction petition asserted a claim of ineffective assistance of appellate counsel and therefore, contends that his argument is not subject to forfeiture. However, points not argued in

the opening brief are forfeited and shall not be raised in the reply brief. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see also *People v. Taylor*, 2019 IL App (1st) 160173, ¶ 41 (finding that a claim raised for the first time in a reply brief was forfeited). Accordingly, any claim of ineffective assistance of appellate counsel has been forfeited.

¶ 66    Forfeiture aside, we find that defendant's claim lacks merit because defendant cannot establish an arguable claim of ineffective assistance for his attorney's failure to fully investigate defendant's insanity defense. Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Id.* Trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client, including what witnesses to call and the defense to be presented at trial. *People v. Clendenin*, 238 Ill. 2d 302, 319 (2010).

¶ 67    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 68    At the first stage of postconviction proceedings, a petition alleging ineffective assistance of counsel may not be dismissed if: (1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result. *Hodges*, 234 Ill. 2d at 17.

¶ 69    Here, defendant argues that his trial counsel's performance was deficient because counsel failed to fully investigate defendant's insanity defense. In his petition, defendant alleged that counsel "blindsided" the parties by raising this defense at trial without a full investigation. The crux of his claim in his petition and on appeal is that counsel was ineffective for failing to call the treating physicians from Cermak to testify on his behalf.

¶ 70    As indicated above, defendant pursued an insanity defense at his trial. Illinois' insanity statute provides that: "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2006). "The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *Id*. § 6-2(b). "When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by clear and convincing evidence that the

defendant is not guilty by reason of insanity." *Id.* § 6-2(e). "Only the insanity occurring during a crime can excuse the defendant, not insanity before or after the crime." *People v. Curry*, 225 Ill. App. 3d 450, 453 (1992).

¶ 71    Under established precedent, trial counsel was not obligated to provide expert witnesses in order to present an insanity defense. See *People v. Smothers*, 55 Ill. 2d 172, 174 (1973) (citing *People v. Childs*, 51 Ill. 2d 247, 257 (1972)) (where the supreme court held expert testimony is not required to raise the issue of sanity). The determination of sanity is not dependent upon any particular type of testimony, expert or otherwise. *People v. Burnett*, 2016 IL App (1st) 141033, ¶ 48. Additional relevant factors in the sanity determination may include observations by lay witnesses made shortly before or after the crime was committed, and the defendant's plan for the crime and methods to prevent detection. *People v. Dwight*, 368 Ill. App. 3d 873, 880 (2006) (citing *Smothers*, 55 Ill. 2d at 175). However, "[b]izarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane." *People v. McCullum*, 386 Ill. App. 3d 495, 504 (2008).

¶ 72    As the record demonstrates, counsel repeatedly pursued issues related to defendant's mental health prior to trial, including his fitness to stand trial and his ability to understand his *Miranda* rights. This strategy continued at trial where counsel presented an insanity defense supported by two expert witnesses, Drs. Leska and Corcoran. Both experts were hired by the defense and examined defendant on multiple occasions. Each found mental defects or diseases affecting defendant, though neither specifically testified that defendant was legally insane at the time of the offense. Based on her evaluations, Dr. Leska opined that defendant suffered from a psychotic spectrum disorder, which includes both schizophrenia and schizoaffective disorder. Following his examination, Dr. Corcoran diagnosed defendant with aphasia stemming from the

blow to his head with a firearm by Officer Soderberg. In his opinion, defendant's aphasia caused disorientation or disorganized thinking, but like Dr. Leska, Dr. Corcoran did not reach an opinion as to whether defendant was legally insane at the time of the offense. In contrast, the State's expert witnesses, Drs. Cooper and Markos, each diagnosed defendant with antisocial personality disorder and found that he was sane at the time of the offenses. Defense counsel thoroughly cross-examined both of the State's expert, including questioning them about the symptoms of antisocial personality disorder in the DSM-5. Counsel clearly demonstrated his preparation and knowledge necessary for defendant's insanity defense. Although expert testimony was not required, none of the experts found defendant legally insane at the time of the offenses.

¶ 73       Further, defendant has not offered any independent evidence that his trial counsel did not interview any of the treating physicians at Cermak. Nevertheless, while defendant's treating physicians from Cermak did not testify, other experts testified extensively about defendant's medical records. From this testimony, it is clear that the Cermak medical records presented contradictory details regarding defendant's mental health. While he was diagnosed as schizophrenic, the doctors repeatedly described defendant's drug-seeking behavior which included malingering, feigning or exaggerated symptoms as well as aggressive behavior. Also, like the defense witnesses who were called on defendant's behalf, none of these treating physicians offered any opinion about defendant's sanity at the time of the offenses. There was nothing in the records from Cermak that indicated defendant suffered from a mental disease or defect at the relevant time of the crimes. And appellate counsel in its brief has not pointed to anything from the medical treating personnel at Cermak to contradict this fact. More important, as part of the insanity defense, there is nothing defense counsel could have presented from these

same records that defendant lacked the substantial capacity to appreciate the criminality of defendant's conduct at the time of these offenses.

¶ 74    Additionally, trial counsel's decision not to call defendant's treating physicians after reviewing defendant's Cermak records is a matter of trial strategy. "Where the circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation." *People v. Holman*, 164 Ill. 2d 356, 371 (1995). In *People v. Tenner*, 175 Ill. 2d 372, 379-81 (1997), the defendant contended that his trial counsel was ineffective for failing to order a mental evaluation prior to trial in order to support an insanity defense. The supreme court concluded that trial counsel made a strategic choice after an investigation into the defendant's personal history failed to disclose any history of mental illness. " '[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' " *Id*. at 380-81 (quoting *Strickland*, 466 U.S. at 990-91). See also *People v. Smith*, 195 Ill. 2d 179, 198-99 (2000) (the supreme court declined to find deficient performance for failing to raise an insanity defense because his diagnosis of borderline personality disorder did not rise to the level of insanity); *People v. Schultz*, 186 Ill. App. 3d 976, 982 (1989) (the reviewing court rejected the defendant's claim of ineffective assistance of counsel where the defendant failed to show that further investigation of his mental history would have supported an insanity defense and nothing in the record demonstrated that he was legally insane at the time of the offense). The record overwhelmingly shows that defense counsel presented a well-organized, methodical, and detailed presentation of the insanity defense.

¶ 75    Defendant's reliance on *People v. Clark*, 2011 IL App (2d) 100188, is misplaced and distinguishable from the present case. In that case, the defendant alleged in his *pro se* postconviction petition that his trial counsel was ineffective for coercing him to plead guilty to the attempt murder of his girlfriend under the mistaken belief that no witnesses were available to testify on his behalf. *Id.* ¶ 8. The defendant asserted that the victim was willing to testify that defendant was "not in his correct mental state" at the time of the offense. Defendant attached an affidavit from the victim in which she stated that the defendant was not taking his medication and was hearing voices at the time of the attack. She further stated that made repeated phone calls to trial counsel indicating her willingness to testify on the defendant's behalf, but her calls were not returned. *Id.* ¶ 9. The State moved to dismiss the petition, which the trial court allowed. *Id.* ¶¶ 10-11. On appeal, the defendant argued that his trial counsel failed to investigate an insanity defense. *Id.* ¶ 14. The Second District, taking the defendant's allegations as true and supported by the victim's affidavit, found the defendant made a substantial showing that his trial counsel was deficient for failing to investigate the victim as a witness to support an insanity defense. *Id.* ¶ 28. The reviewing court further held the defendant made a substantial showing of prejudice based on the defendant's allegation that he pleaded guilty because his attorney told him that there were no witnesses to support his defense. *Id.* ¶ 29.

¶ 76    Unlike in *Clark*, the trial record in this case clearly established that trial counsel thoroughly investigated defendant's mental health throughout the proceedings. In contrast with *Clark*, defendant did not attach any documentation to support his claim. The record belies defendant's claim that counsel failed to properly prepare his defense and demonstrates trial counsel was clearly familiar with defendant's medical records as evidenced by his direct and cross-examination of witnesses. Thus, it was trial strategy by defense counsel not to call

defendant's treating physicians and does not support defendant's claim of a lack of investigation. As discussed above, multiple doctors noted in defendant's medical history that defendant appeared to be malingering or was being manipulative for his own gain, such as to seek medication or for more preferable housing in the jail. Considering these records, counsel clearly concluded that having these doctors testify at trial would not have aided defendant's insanity defense. It was counsel's right to decide matters of trial strategy, even though that strategy was unsuccessful, it does not establish a denial of the effective assistance of counsel. See *Fuller*, 205 Ill. 2d at 331. Based on our review of the record, defendant cannot establish that it is arguable that his trial counsel's performance was objectively unreasonable as required under *Strickland*.

¶ 77    Even if defendant could demonstrate that his trial counsel's performance was arguably deficient, defendant cannot show that he was arguably prejudiced. Specifically, he has not demonstrated a reasonable probability the result of the trial would have been different if his treating physicians had been called. None of the expert witnesses at trial found defendant to have been legally insane at the time of the offenses. Dr. Corcoran, defendant's most impressive expert witness, was the medical director of Chicago Read Mental Health Center, chief psychiatrist in DuPage County, and the clinical director of state operated facilities for the Illinois Department of Human Services. Nevertheless, Dr. Corcoran, even after reviewing defendant's Cermak records and interviewing defendant, did not diagnose defendant with a psychotic disorder. Nothing in defendant's Cermak medical records suggest that defendant was unable to appreciate the criminality of his actions at the time of the offenses. Gaichas, the treating EMT, found defendant to be lucid and able to answer questions immediately after the events. Significantly, defendant has not shown any history of mental illness prior to July 2010. While his medical records from Cermak indicated a diagnosis of schizophrenia, the records also provided many observations

from different treating physicians showing defendant to be manipulative, as well as malingering, feigning or exaggerating symptoms to seek medication for recreational highs and to obtain different housing in the jail. The records also showed that defendant stopped taking antipsychotic medication, but defendant did not decompensate or show symptoms of schizophrenia, which Dr. Markos found especially relevant in his evaluation.

¶ 78    Defendant makes an argument that his trial counsel's ineffectiveness resulted in the trial court's rejection of a guilty but mentally ill finding. We reject this claim beginning with forfeiture principles. As already indicated above, defendant's ineffective assistance claim is based upon evidentiary matters all contained in the record on appeal. Defendant catalogues the varying Cermak doctors' reports as evidence of his mental illness which he contends support his claim that counsel failed to properly raise a finding of guilty but mentally ill. However, postconviction proceedings are not a substitute for a direct appeal. *People v. Robinson*, 2020 IL 123849, ¶ 48. And the trial court does not redetermine the guilt or innocence of the accused. *People v. Simpson*, 204 Ill. 2d 536, 546 (2001). Any issues that could have been raised could have been raised on direct appeal are forfeited. *Petrenko*, 237 Ill. 2d at 499. Arguing that the court would have found defendant guilty but mentally ill as a result of trial counsel's failure to call these doctors could have been raised on direct appeal and is therefore forfeited. Moreover, defense counsel requested a finding of guilty but mentally ill, but the trial court rejected that theory because there was no testimony establishing defendant was insane or guilty but mentally ill at the time of the commission of these offenses. See *Fuller*, 205 Ill. 2d at 330-31 (although trial counsel's strategy was ultimately unsuccessful, it does not establish a claim of ineffective assistance).

¶ 79    Defendant has also failed to show that a finding of guilty but mentally ill would have arguably been different if his treating physicians had been called. Section 6-2 of the Criminal Code of 2012 provides, in relevant part:

> "(c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.
>
> (d) For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior." 720 ILCS 5/6-2(c), (d) (West 2014).

The defendant bears the burden to prove by a preponderance of the evidence that he was mentally ill, as defined above. *People v. Urdiales*, 225 Ill. 2d 354, 427-28 (2007); 725 ILCS 5/115-3(c)(3) (West 2014).

¶ 80    Defendant has not shown the result would have been different had these other witnesses been called. No medical personnel from Cermak even hint that defendant was legally insane or that a mental illness, *i.e.*, a substantial disorder of thought, mood, or behavior, impaired his judgment. To the contrary and as previously discussed, defendant was lucid and responsive immediately following the offenses and was not referred for a mental health evaluation in the jail until four months after his admission. Trial counsel fully investigated defendant's mental health for fitness to stand trial, his ability to appreciate the *Miranda* warnings, and his sanity at the time of the offense, and at no point did the trial court find a mental illness impacted defendant's ability to appreciate his actions and the proceedings. The Cermak records disclosed that

defendant had discontinued the antipsychotic medication with no appreciable symptoms of schizophrenia recurring. Defendant cannot establish that a mental illness impacted his actions at the time of the offense and the trial court's rejection of counsel's argument does not render defense counsel ineffective.

¶ 81     We find the cases relied on by defendant to be distinguishable. See *People v. Wood*, 2014 IL App (1st) 121408, ¶¶ 67-77 (where a physician testified at sentencing that the defendant had been diagnosed with schizophrenia by seven doctors and he had suffered from the illness for over ten years); *People v. Gurga*, 150 Ill. App. 3d 158, 166-68 (1986) (expert witnesses for both sides "submitted considerable evidence showing that defendant was suffering from a substantial disorder of mood or behavior which impaired his judgment" and had an "extensive" history of mental health problems). In contrast, defendant had no prior history of substantial mental health issues and he has not shown that his judgment was impaired at the time of the offense due to a mental illness. Thus, defendant cannot show that he was arguably prejudiced under *Strickland*.

¶ 82     Accordingly, defendant's claim of ineffective assistance of trial counsel lacks merit and the trial court properly dismissed his postconviction petition and we affirm the decision of the circuit court of Cook County.

¶ 83     Affirmed.